**STERLING DISTRIBUTORS, INC.,**
**Plaintiff,**

v.

**George D. PATTERSON, Director of Internal Revenue, Defendant.**

**Civ. A. No. 63-348.**

United States District Court
N. D. Alabama, S. D.

Dec. 18, 1964.

D. H. Markstein, Jr., and Walter L. Mims, Birmingham, Ala., for plaintiff.

Macon L. Weaver, U. S. Atty., and E. Ray Acton, Asst. U. S. Atty., and John B. Jones, Jr., Acting Asst. Atty. Gen., C. Moxley Featherston, Myron C. Baum, and O. Jan Tyler, Dept. of Justice, Washington, D. C., for defendants.

LYNNE, Chief Judge.

This action for recovery of a refund of income taxes for the calendar years 1959 and 1960 was submitted for judgment of the court, without the intervention of a jury, upon the pleadings, the order on pretrial hearing, the stipulation of facts filed herein, and evidence adduced upon the trial.

The facts, as stipulated by the parties and found by the court to be true, are set out in the margin.[1] Relating basical-

---

1. It is hereby stipulated and agreed by and between the respective parties that the following facts may be taken as true, subject to the right of either party to object to the materiality or relevancy thereof, or to introduce any further evidence not inconsistent therewith:

1. This is an action to recover income taxes paid by plaintiff. Jurisdiction and venue are conferred on this Court by Title 28, United States Code, Section 1340 and Section 1391.

2. Plaintiff is a corporation organized under the laws of the State of Alabama with its principal place of business in the City of Birmingham, Alabama.

3. The defendant is the District Director of Internal Revenue for the District of Alabama, with whom the plaintiff filed its federal income tax returns for the calendar years 1959 and 1960, copies of which are attached to this stipulation and are identified as Exhibits A and B.

4. For the calendar year 1959, plaintiff reported on its federal income tax return taxable income of $17,115.80 and paid the amount of income tax shown to be due thereon of $5,125.99. Thereafter, on examination, the Internal Revenue Service made several adjustments in plaintiff's federal income tax return for 1959 resulting in a deficiency in taxes of $18,907.59. Plaintiff agreed to all adjustments except the disallowance of $27,351.47 of deductions.

5. For the calendar year 1960, plaintiff reported on its federal income tax return taxable income of $48,166.75 and paid the amount of income tax shown to be due thereon of $19,449.51. There-after, on examination, the Internal Revenue Service made adjustments in plaintiff's federal income tax return for 1960 resulting in a deficiency in taxes of $23,978.63. Plaintiff agreed to all adjustments except (1) the disallowance of $33,165.09 for various deductions and (2) the disallowance of $1,500 for salary paid to Agatha Nakos.

6. During the years 1959 and 1960, plaintiff made gifts of beer in connection with its sales of beer. Free beer was not given to every customer nor were the customers who received free beer given the same amounts. The cost to plaintiff of beer given to its customers for the year 1959 was $10,313.33, and the cost of beer given to its customers for the year 1960 was $19,183.78. These amounts were included in the cost of goods sold in computing taxable income on the federal income tax returns for each of the years. These deductions were disallowed by the Internal Revenue Service.

7. During the years 1959 and 1960, plaintiff, by issuing checks payable to cash, made cash rebates to certain customers in the amount of $7,326.92 and $574.95, respectively, which represented a discount of the purchase price paid by customers for beer sold by the plaintiff. Cash rebates were not given to all customers. These amounts were taken as deductions for discounts, advertising and route expenses on the federal income tax returns for each of the years and were disallowed by the Internal Revenue Service.

8. In 1959, plaintiff took a deduction as advertising expense of $4,282.82 which

ly to identified trade or business expenses claimed by plaintiff as authorized deductions in each of such years under the provisions of section 162 of the Internal Revenue Code of 1954 [2] and disallowed by the Internal Revenue Service, they serve merely to frame the real controversy pointed up by the testimony of live witnesses.

■ At the conclusion of the trial, the court announced its impression that claimed deductions in 1959 for payments to or for the benefit of licensees in the

represented an accumulation of credit sales to two customers as follows:

| | | |
|---|---|---|
| Gilbert's | Drive-In | $2,736.15 |
| Nu-Way | | 1,546.67 |
| | Total | $4,282.82 |

This deduction was disallowed by the Internal Revenue Service.

9. During both years, plaintiff made certain payments to or for the benefit of its customers in various small amounts and deducted the expenditures on its federal income tax returns. The Internal Revenue Service disallowed $400 for 1959 and $305.80 for 1960, both of said amounts which were estimated by the Internal Revenue Service. In addition, plaintiff purchased certain whiskey in 1959 which was given to persons unknown in the amount of $193.13. The Internal Revenue Service disallowed this amount as a deduction.

10. For the year 1959, there was a general ledger adjustment deduction taken in the amount of $4,835.27 which included a charge-off of petty cash vouchers in the amount of $11,377.03 for credit sales made to customers for which the

amount of $400 and for the cost of gift whiskey in the amount of $193.13, and in 1960 for salary paid to Agatha Nakos in the amount of $1500 and for payments to or for the benefit of licensees in the amount of $305.80 were properly disallowed. That impression has ripened into a firm conviction and the court holds that plaintiff is entitled to no refund on account of their disallowance.

With respect to the remaining deductions claimed in each year, matters stand differently. In substance, they represent either premiums or presents in the form

plaintiff did not seek to collect. The $4,835.27 deduction was disallowed by the Internal Revenue Service.

11. During 1960, plaintiff made cash rebates out of its petty cash fund to certain customers in the amount of $391.70 which represented a discount of the purchase price paid by the customers for beer sold by the plaintiff. This amount was taken as a deduction on the federal income tax return for 1960 and was disallowed by the Internal Revenue Service.

12. In 1960, plaintiff wrote off as an account receivable of $1,105.74 which represented an unpaid balance of an active account. The receivable resulted from the sale of beer on credit. The deduction was disallowed by the Internal Revenue Service.

13. During 1960, plaintiff took as a deduction the sum of $11,377.03 which represented uncollected petty cash tickets for credit sales. This deduction was disallowed by the Internal Revenue Service.

14. The total deductions claimed by plaintiff and disallowed by the Internal Revenue Service as explained in the above paragraphs are as follows:

| | 1959 | 1960 |
|---|---|---|
| Cost of gift beer | $10,313.33 | $19,183.78 |
| Rebates by checks payable to cash | 7,326.92 | 574.95 |
| Charge-off of accounts receivable from credit sales | 4,282.82 | 1,105.74 |
| Payments to or for benefit of licenses | 400.00 | 305.80 |
| Cost of gift whiskey | 193.13 | |
| Deduction for general ledger adjustment | 4,835.27 | |
| Petty cash rebates | | 391.70 |
| Petty cash credit sales not collected | | 11,377.03 |
| Total | $27,351.47 | $32,939.00 |

15. The case may be tried to the Court without the intervention of a jury.

2. "§ 162. Trade or business expenses
(a) In general.—There shall be al-

lowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *."
26 U.S.C. (I.R.C.1954) § 162 (1958 Ed.)

of free beer or rebates given to retail outlets to induce the purchase of beer distributed at wholesale by plaintiff or losses sustained by it on credit sales.

The business of wholesale distribution of beer in Jefferson County is highly competitive. Plaintiff's competitors, handling the brands of rival manufacturers, have at all pertinent times and without exception followed the identical practices of offering inducements and extending credit. For plaintiff to have refrained from doing likewise would have resulted in a substantial loss of business. This is the uncontroverted evidence which would lead unerringly to the conclusion that such expenses were ordinary and necessary in the statutory sense [3] but for the consideration of Alabama public policy which led the Internal Revenue Service to disagree.

While neither the Internal Revenue Code of 1954 nor its predecessors contain any prohibition against deductibility of business expenses, otherwise ordinary and necessary, which violate or frustrate public policy, the courts, in the process of construing the limiting adjectives, "ordinary" and "necessary" have inevitably added such a gloss to the statute. In its latest definitive pronouncement upon the subject the Supreme Court, in Tank Truck Rentals v. Commissioner, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958), announced a test of nondeductibility, which this court seeks to apply:

"[T]he *test* of nondeductibility always *is the severity and immediacy*

*of the frustration resulting from allowance of the deduction.* The flexibility of such a standard is necessary if we are to accommodate both the congressional intent to tax only net income, and the presumption against congressional intent to encourage violation of declared public policy." [Emphasis added.]

Too plain to admit of argument or extended discussion are the facts that plaintiff, by offering the inducements of free beer and rebates, has openly violated the provisions of title 29, section 37 of the Code of Alabama, and by extending credit has offended the provisions of title 29, section 41 of the Code of Alabama, and has also thereby committed acts in violation of pertinent regulations promulgated by the Alabama Beverage Control Board pursuant to the authority of title 29, section 6 of the Code of Alabama. All of such offenses constitute misdemeanors as provided by title 29, section 78 of the Code of Alabama.

If that were all, the court would encounter little difficulty in concluding that such deductions were properly disallowed and would be content to rely upon Dixie Machine Welding & Metal Works, Inc. v. United States, 315 F.2d 439 (5th Cir. 1963) and United States v. Winters, 261 F.2d 675 (10th Cir.1958) together with the cases cited and discussed therein. But the tale is not yet told. For the undisputed testimony of qualified and credible witnesses [4] makes it abundantly clear

---

3. Deputy v. DuPont, 308 U.S. 488, 60 S. Ct. 363, 84 L.Ed. 416 (1940); Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L. Ed. 312 (1933); Commissioner v. People's Pittsburgh Trust Co., 60 F.2d 187 (3d Cir. 1932); Cannon Valley Milling Co., 44 B.T.A. 763 (1941); B. Manischewitz Co., 10 T.C. 1139 (1948).

4. The following excerpts from the testimony of witnesses are reproduced from the transcript:

A. TESTIMONY OF MARVIN DAWKINS.

"Q Mr. Dawkins, have you ever been connected as an employee or official of the Alabama Beverage Control Board?

"A I have.

"Q What was that capacity, please, sir, and the dates?

"A I was a member of the Board in 1947 for a year and three days and Administrator of the Department from January, 1955, to January, 1959.

"Q During the time, Mr. Dawkins, you were a member of the ABC Board and during the four years you were Administrator of the ABC Board, did the ABC Board have a rule or regulation which prohibited beer distributors from selling beer on credit?

"A State that again, please.

"Q Did the ABC Board have a rule or regulation which prohibited beer distribu-

that the Alabama Beverages Control Board, vested by the provisions of title 29, section 5 of the Code of Alabama with plenary authority to enforce such stat-

tors from selling beer to its customers on credit sales?

"A There was such a rule from 1955 to 1959.

"Q During the same time was there a rule or regulation of the ABC Board which prohibited a beer distributor from giving any inducements or rebates in order to promote sales to his customers or any other reason?

"A There was.

"Q During the time you were Administrator of the ABC Board did you have knowledge that—as to whether or not there were any violations by the distributors of the credit sales regulation?

"A I did.

"Q Did you during that same time have knowledge of whether or not there was any violation by the beer distributors · in the State of Alabama of the regulation prohibiting inducements or rebates?

"A I did.

     *      *      *      *      *

"Q Were there violations of these two regulations?

"A There were.

"Q Mr. Dawkins, did you as Administrator call to the attention of the ABC Board that these regulations were being violated?

"A On numerous occasions.

"Q Did the ABC Board give you instructions in connection with the information you gave them?

"A Quite a few occasions told me to ignore and forget it.

"Q During the time you were Administrator did you make a case against any distributor for selling beer on credit?

"A None to my knowledge.

"Q If there had been one, you would have been the one to make it?

"A I would have had to present it to the Board for hearing.

"Q During the four years you were Administrator did you make any case against any beer distributor for giving any remuneration or rebate during that time?

"A We did not.

## B. TESTIMONY OF EDWARD AZAR.

"Q Mr. Azar, what was your occupation in 1959 through 1963?

"A I was Administrator of the Alabama Beverage Control Board.

"Q Is that a full-time job?

"A Yes, sir.

"Q Will you explain the duties of that office, Mr. Azar, please?

"A Yes, the State Beverage Control Act is administered by a three-man Board whose members serve on a part-time basis and they in turn select or employ an Administrator who is the full-time executive head of the Department, and in that capacity runs the whole Department, such as the employment of personnel, the carrying out of directives and policy laid down by the Board, and conducting of hearings and that sort of thing.

"Q During your four years in office as Administrator of the ABC Board, did the ABC Board have a rule or regulation which prohibited the sale of beer by distributors to retailers on credit sales?

"A Yes, sir.

"Q During that same period of time did the ABC Board have a law or regulation which prohibited the giving of inducements or rebates or discounts by wholesale beer distributors to their customers?

"A Yes, sir.

"Q During your administration did you have knowledge of any violations of these regulations by the beer distributors of the State of Alabama?

"A Yes, sir, I understood that and believed it to be so.

"Q Were these violations widespread, to your knowledge, or were they widespread in the area of Jefferson County here or other areas?

"A Yes, sir, they were widespread throughout the wet counties of the State, where the beer distributors operated.

"Q During your administration did you as Administrator or did the ABC Board make any cases against any beer distributor for selling his beer on credit terms?

"A I can't recall. I am not sure. We may have made one case. I can't remember a case. My recollection could be refreshed. I don't remember any such case.

"Q During the four years as Administrator did the ABC Board make any case against any beer distributor for giving any remuneration or inducement or rebate or kickback?

"A I can't recall any such case.

"Q If any such case had been made, you should have been the person who would have made the case or heard it? ·

"A That is correct.

"Q Were these regulations, Mr. Azar, regulations which were made for the dealers or for the consuming public?

     *      *      *      *      *

"A Our view of these regulations were that they were fair trade or industry

utes and regulations has determined not to do so and to ignore them and has so directed its administrator and investigators. Thus the law upon which the Internal Revenue Service relies has become a dead letter, not expressive of current community sentiment at all.[5]

█ It would be an apparent anachronism for this court now to hold that the expenses actually incurred by plaintiff in carrying on the trade or business violate or frustrate the public policy of the State of Alabama expressed in legislation and regulations which the State, through its authorized officers, long ago determined should not be enforced.

Judgment will accordingly be entered in conformity with this memorandum opinion.

regulations. The regulations were promoted by the industry and as far as the enforcement thereof, we didn't feel that there was any compelling public interest about enforcing the thing. It was a matter the industry said they wanted and if they didn't want to live by them we had more important things to do and that was our attitude.

"Q And by "industry" you mean the beer distributors themselves?

"A Yes, sir.

C. TESTIMONY OF ROBERT J. LANCASTER.

"Q Your name is Robert J. Lancaster and you live at 612–26th Avenue, East, Tuscaloosa, Alabama?

"A Yes, sir.

* * * * *

"Q Before you retired by whom were you employed?

"A The State of Alabama.

"Q What department?

"A ABC Board.

* * * * *

"Q And your duties were in Jefferson County?

"A Yes, sir.

"Q As a part of your duties were you charged with the enforcement of the rules and regulations of the ABC Board?

"A Yes, sir.

"Q You were aware the Board had regulations which prohibited credit sales and also prohibited discounts, were you not?

"A Yes, sir.

"Q Did you have any instructions from your superiors at the Board, particularly during the period we will say 1959 and 1960, which are the years involved in this lawsuit, concerning what you should do toward enforcement of those to the particular regulations in Jefferson County, Alabama?

"A We did.

"Q What were your instructions?

"A Not to pay any attention to it.

"Q Did you comply with those instructions?

"A Yes, we didn't fool with the wholesalers.

* * * * *

"Q Did it come to your attention it was common practice in Jefferson County for wholesalers to give one case of beer away with a certain number of cases?

"A Yes, sir, there was rumors it was going on.

"Q Do you have any information whether it was a common practice to give credit sales?

"A By all of them, yes, sir.

5. Kirtz v. United States, 304 F.2d 460 (Ct.Cl.1962); Roland D. Stacy, 63–2 USTC ¶ 9746 (S.D.Miss.1963) (for I.R.S. acquiescence in Stacy, see Technical Information Release No. 601, June 8, 1964); Porterfield Distributing Co., 63–1 USTC ¶ 9230 (W.D.Va.1961). See generally Comment, Business Expenses, Disallowance, and Public Policy, 72 Yale L.J. 108 (1962).