KENNETH W. BROWN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brown v. Commissioner
Docket No. 903-90
United States Tax Court
T.C. Memo 1992-40; 1992 Tax Ct. Memo LEXIS 46; 63 T.C.M. (CCH) 1866; T.C.M. (RIA) 92040; January 21, 1992, Filed *46 Decision will be entered under Rule 155. Samuel R. McCord and Marion F. Walker, for petitioner. Alan Friday, for respondent. FAY, Judge. FAY
MEMORANDUM OPINION By statutory notice of deficiency, respondent determined deficiencies in and additions to petitioner's Federal income tax in the following amounts:  Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)(1)
1983
$ 127,004
$ 31,751
$ 6,832
1984
317,171
31,882
16,769 Additions to Tax
Year
Sec. 6653(a)(2)
Sec. 6661(a)
1983
50% of interest
$ 31,751
due on $ 127,004
1984
50% of interest
79,293
due on $ 317,171
After concessions by both parties, the remaining issues presented for our consideration are: (1) Whether an Alaska regulation that limited the pay of bingo hall employees to $ 1 per hour *47 over the State minimum wage was "generally enforced", within the meaning of section 162(c)(2), during the years in question. We hold that respondent has not shown by clear and convincing evidence that such regulation was "generally enforced" during 1983 and 1984. (2) Whether expenses for "Free and Bonanza Bingo" and "wages, commissions, and other compensation" in relation to petitioner's gaming business should be disallowed for lack of substantiation. We hold that such expenses are partially substantiated. (3) Whether petitioner is liable for the additions to tax under section 6653(a)(1) and (2) (negligence). We hold petitioner is liable for the above-referenced additions to tax. (4) Whether petitioner is liable for the addition to tax under section 6661 (substantial understatement). We hold petitioner is liable for the above-referenced addition to tax if the numerical thresholds of section 6661 are met. For purposes of clarity, the findings of fact and opinion have been combined. The stipulation of facts and exhibits thereto are incorporated herein by this reference. Petitioner was a resident of Jasper, Alabama, at the time he filed his petition with this Court. During *48 1983 and 1984, petitioner owned and operated a bingo parlor in Alaska called Northern Lights Bingo (NLB). The types of gaming offered at NLB consisted of bingo, pull tab cards, and a dart wheel. The bingo parlor averaged between 60 to 70 people per night in 1983 and between 160 and 170 people by the end of 1984. As such, NLB was the largest bingo parlor operating at the time in the State of Alaska. During the years at issue, the State of Alaska issued gaming permits only to nonprofit organizations that had been active in the State for 5 years or more. Some of these nonprofit organizations would allow certain individuals (operators) to obtain their permits to operate gaming halls. Petitioner obtained permits from five nonprofit organizations (charities), which were the Alaska Retarded Citizens Association (ARCA), the March of Dimes, the Spenard Lions Club, Mt. McKinley Lions Club, and Barrier Free Alaska. Petitioner, as operator, had written agreements with some of the charities. By law, each gaming permit was good for the operation of bingo activities for 9 days per month. Operators, such as petitioner, would often gather several permits together in order to run a full-time *49 gaming hall. This allowed NLB to open every day of the week year-round. In exchange for the right to operate the permits, petitioner would furnish the hall and the equipment, provide for the advertisement, hire and fire employees, and generally conduct bingo games. During 1983 and 1984, charity gaming operations in Alaska operated under State regulation. The charities, not the operators, were subject to the Alaska gaming statutes and regulations promulgated thereunder by the Department of Revenue (Department). [2] Under these regulations, the charities were required to provide an annual financial report (AFR) of gaming operations to the Department for review. On these reports, the charities were allowed to deduct expenditures that were reasonable and necessary from the gross receipts derived from gaming operations in order to arrive at the net proceeds amount upon which a 1 percent State tax was levied. A subsection of the regulations, however, specifically provided that wages paid to workers operating the games could not exceed $ 1 above the State minimum wage. [3] The State minimum wage during the years at issue was $ 3.85 per hour. Thus, each charity could deduct up to $ 4.85 *50 per hour for wage expenses on their AFR and be in compliance with this regulation. The regulation prohibiting excess wages was promulgated in the mid-sixties and repealed in 1988. The Alaska gaming regulations also provided that any false statement on any report required to be furnished to the Department would *51 constitute basis for the suspension or revocation of the gaming permits issued to the charities. [4] The charities, however, submitted their AFR's to the Department based, in part, on the financial information provided by petitioner, who actually operated the bingo parlor. Petitioner paid wages of $ 10 per hour to NLB floor employees and $ 200 per shift to the managers or supervisors. [5] In 1983, all salaries were paid in cash, and in 1984, employees were paid the legal rate ($ 4.85) by check and the excess ($ 5.15) was paid in cash. For purposes of internal payroll recordkeeping, external reporting to the charities, and the IRS (Forms 941), petitioner only deducted the allowable rate of $ 4.85 per hour for wage *52 expenses. The excess deductions were not reported to the charities or the IRS because of the regulations at issue. Since petitioner could not deduct the full extent of the wage expense he was incurring in the operation of NLB, petitioner omitted income that NLB was generating commensurate with the excess wages, and failed to report such income to the charities and the IRS. On August 3, 1984, petitioner, as president of the State of Alaska Gaming Association, wrote a letter directed at "Concerned Citizen" in which he protested certain proposed bingo legislation. During that same time period he testified before the Alaskan legislature. Shortly thereafter, an investigation was begun by the Department of several bingo halls. Those investigated were NLB, Cook Inlet Native Association Bingo, and Jackpot Bingo. The simultaneous investigation of these three bingo halls was the first ever audit by the State *53 of Alaska of a bingo hall. The investigation by the Department in 1984 was performed by John Rush (Rush), and he determined that petitioner had understated gross receipts from pull tab [6] operations by $ 810,000 during 1983 and 1984. His findings provided the basis for the increase adjustment in petitioner's income for the tax years 1983 and 1984 contained in the notice of deficiency. By stipulation, petitioner acknowledged that the increase of $ 238,374.10 in 1983 and $ 587,132 in 1984 contained in the notice of deficiency is correct. [7] In his petition, however, petitioner requested additional deductions which correspond to the additional income. After concessions, the remaining additional deductions sought by petitioner are: 1983
1984 Free and Bonanza Bingo
$ 44,000
$ 124,000
Wages, commissions and other
102,000
289,000
compensation
*54 In 1985, after the investigation by the Department was completed, petitioner was indicted under Alaska law for fraud and embezzlement. These charges were later dropped after petitioner pled guilty to unsworn falsification charges. Petitioner, however, was never cited or indicated for violating the Alaska gaming laws. Furthermore, none of the charities from whom petitioner obtained the permits lost their permits by State enforcement of the gaming regulations at any time subsequent to the investigation. Section 162(c)(2)
Whilesection 162(a) supplies the general rule that allows the deduction of ordinary and necessary business expenses, section 162(c)(2) provides the following exception: (2) OTHER ILLEGAL PAYMENTS. -- No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage *55 in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud). [Emphasis added.]
Thus, although we find that NLB's excess payments for wages were ordinary and necessary business expenses which are generally deductible under section 162(a), we must nonetheless disallow their deduction if they fall under section 162(c)(2). Respondent bears the burden of proving, by clear and convincing evidence, that the excess payments were illegal and generally enforced and that the other requirements for disallowance under section 162(c)(2) are satisfied. Boucher v. Commissioner, 77 T.C. 214, 218 (1981), affd. 693 F.2d 98 (9th Cir. 1982); Sec. 1.162-18(b)(4), Income Tax Regs.
We hold that respondent has failed to carry his burden *56 of proof. Specifically, we hold that respondent has not proven, by clear and convincing evidence, that the regulation was generally enforced, a prerequisite for disallowance under section 162(c)(2). In support of his contention that the Alaska gaming regulation prohibiting excess wages was generally enforced, respondent presented the testimony of Ms. Parsons, who began working with the Department in the gaming division in August 1982. As part of her duties, Ms. Parsons reviewed applications for permits and AFR's. The practice of "enforcement" in 1983 and 1984 was that, when there was a violation of the statute or regulations apparent from the face of the AFR, Ms. Parsons would prepare a corrected AFR for the charity and allow them to pay the additional tax owed. In addition, she testified that initial warning letters would be sent to the charities regarding violations of the regulations and sometimes a second letter threatening revocation of their permit if the charities failed to comply with the first letter. Ms. Parsons' testimony however, was scrambled and confused. She did not know with any degree of certainty how many such letters were sent. Furthermore, not a single such *57 letter was introduced into evidence or clearly established by her testimony for the years at issue, or any time prior to that. [8] She did not know if there had ever been a suspension or a revocation of a permit. Nor could Ms. Parsons even remember who the director of the gaming division was during 1983 and 1984. Thus, we find that Ms. Parsons' overall testimony was generally unreliable, and, as such, we attach minimal value to it. Respondent also contends that the simultaneous investigations performed by Rush of NLB and two other bingo halls constituted "general enforcement". At the outset, we recognize that "generally speaking, law enforcement is thought of as encompassing the prevention of, as well as the detection of and punishment for, violations of the law." Boucher, supra at 219. We find, however, respondent has not shown by "clear *58 and convincing evidence" that the investigations were in connection with the enforcement of the specific regulation that prohibited paying wages over the legal rate. The investigation by Rush was the first audit ever of a bingo hall in Alaska. The audit of NLB focused primarily on the underreporting of gross receipts by NLB from its pull tab operations. As a result of the investigation, petitioner was indicted for fraud and embezzlement, charges that were later dropped by the State of Alaska. The enforcement of the Alaskan statutes dealing with embezzlement and fraud, however, are not relevant as to whether the regulation prohibiting excess wages was generally enforced. They are completely unrelated statutes. The second ultimate outcome of the investigation was five stipulated settlements reached between the charities and the Department after the charities had received notices of proposed suspension or revocation of their permits. [9] All five stipulations, at first, purport to limit the maximum amount of wages that can be claimed by the charities in the future on their AFR's to $ 4.85 per hour (the legal limit set by the regulation in question, 15 Alaska Admin. Code sec.105.220(b)(8)). *59 However, the stipulations all go on to state: exceeding the limits specified in 15 AAC.220(b)(8) shall not constitute grounds for the revocation or suspension of Respondent's gaming permit, so long as the wage and other compensation are not unreasonable, unnecessary, or exorbitant under 15 AAC 105.190(7) and 15 AAC 105.290. [Emphasis added.]
Respondent's position that the State of Alaska through the Department generally enforced the regulation prohibiting payouts of excess wages is undercut by the fact that the Department stipulated that it would not revoke or suspend the permits of these charities that, in fact, had paid excess wages. In addition, respondent failed to show any evidence of permit revocation(s) for violations of this regulation during the years at issue or at any time prior to the years in question. Respondent also *60 failed to elicit any credible testimony of lack of State resources devoted to enforcement of the regulation, or to elicit testimony that the lack of any enforcement was due to a lack of widespread violation of the regulation. In sum, respondent has failed to carry his burden of proof, in proving by clear and convincing evidence that the regulation at issue was generally enforced during 1983 and 1984. Substantiation
In his petition, petitioner requested additional deductions for wages paid of $ 102,000 and $ 289,000 in 1983 and 1984, respectively, in excess of those allowed by respondent on audit of $ 141,206 for the 16-month period ended December 31, 1984. Respondent does not deny that petitioner made payments of wages in excess of $ 4.85 per hour; instead respondent contends that petitioner has failed to substantiate such excess amounts. The taxpayer bears the burden of proof in substantiating claimed deductions. Deputy v. DuPont, 308 U.S. 488, 493 (1940). In support of the claimed excess wage expenses, petitioner offered the testimony of his bookkeeper, Renee Manning (Manning). Manning produced a spreadsheet based in part on payroll journals for NLB. *61 These payroll journals were contemporaneously kept during 1983 and 1984. The spreadsheet was created in 1985 for use in petitioner's criminal proceeding. On this spreadsheet, Manning took the hours each employee worked and multiplied them by $ 10. Managers or supervisors were calculated at $ 200 per bingo session. We find these rates to be reasonable and supported by the record as well as ordinary and necessary. Sec. 162(a)(1). Thus, in accordance with the spreadsheet, we find petitioner has adequately substantiated deductions for wages paid of $ 68,753.20 and $ 322,105.96 for 1983 and 1984, respectively. [10] Manning also testified that she had modified the spreadsheet to include a $ 6,100 janitorial allowance in 1983 and additional managerial expenses of $ 25,000. [11] Based on Manning's testimony and other evidence in the record, we find petitioner has adequately substantiated the janitorial and management expenses as well. [12]
*62 Petitioner also requests deductions for "Free and Bonanza Bingo" prize payout expenses of $ 44,000 and $ 124,000 for 1983 and 1984, respectively. Respondent contends these expenses are improper because they are not adequately substantiated. Free Bingo was used to lure customers to the bingo hall. Patrons who purchased bingo cards for the regular program at regular prices received a Free Bingo sheet as well. Petitioner testified that Free Bingo paid $ 150 per night until it was increased to $ 200 at some point in 1984. Bonanza Bingo was a game designed to keep the bingo patrons at the parlor once they got there. Players paid $ 3 for a "soft card" of six games or $ .50 for a "little single". Numbers were called throughout the entire night so that players in order to win, had to remain at the bingo parlor until late in the session. Bonanza Bingo paid $ 200 per night. The amounts given away by NLB in "Free and Bonanza Bingo" were not reported to the charities because they exceeded a regulation that limited the amount of prizes that could be paid out to $ 5,000 per night. [13] No contemporaneous records were kept of the payouts from "Free and Bonanza Bingo". Petitioner, however, *63 prepared two schedules that purport to calculate the total amount of prizes paid out. Petitioner's testimony concerning the existence and amount of payouts made of "Free and Bonanza Bingo" were corroborated by Manning, whom we find to be a credible witness. Additionally, the flyers used by NLB in advertising their games confirm the existence of Bonanza Bingo and amount of payoffs therein. Thus, based on the record as a whole, we find that petitioner is entitled to additional deductions for "Free and Bonanza Bingo" of $ 44,000 and $ 124,000 for 1983 and 1984, respectively. These expenses were ordinary, reasonable, and necessary expenses incurred in operating NLB. At trial, petitioner requested an additional deduction of $ 16,334 for unpaid accounts receivables. This requested deduction is based on a "credit book" which Manning testified *64 was maintained as a record of advancements to customers. The $ 16,334 represents the uncollected balance. Petitioner's evidence of the uncollectibility of these accounts consists of Manning's statement that she doesn't "believe" the accounts receivables were collectible. Furthermore, the entries on the credit book are disorganized, unsystematic, and barely comprehensible. The burden is on petitioner to establish that he is entitled to these additional deductions. Given this record, his burden has not been met. Finally, petitioner's final request at trial for a deduction of $ 17,512 relating to his beginning bank balance is without merit. Section 6653(a)(1) and (2) Additions to Tax
Section 6653(a)(1) provides that, if any part of an underpayment is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an addition equal to 5 percent of the underpayment. Section 6653(a)(2) provides for an additional amount equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Respondent's determinations are presumptively correct. Rule 142(a). The burden is upon petitioner to *65 prove the negligence additions to have been imposed in error. Petitioner failed to present evidence on this issue. Accordingly, respondent's determination is sustained. Section 6661 Addition to Tax
Section 6661 provides for an addition to tax of 25 percent on any underpayment attributable to a "substantial understatement" of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Respondent has determined that petitioner is liable for additions to tax pursuant to section 6661 for the years in issue. Petitioner has presented no evidence to the contrary. Therefore, after taking into account all concessions and adjustments, if the Rule 155 computation, which we will direct, reveals that petitioner substantially understated his income tax liability for any year, then we will sustain the addition to tax for that year. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Petitioner, on brief, argues that, because the Alaska statutes and regulations apply only to the charities and not to operators (such as petitioner), he was not subject to direct enforcement action by the State against him. We, however, find that, if the State revoked or suspended the charity's license, he too would have been subject to the "loss of license or privilege to engage in a trade or business" contemplated by section 162(c)(2)↩, albeit indirectly. 3. In its relevant part, 15 Alaska Admin. Code section 105.220(b)(8) provided that "these wages shall be paid only for the number of hours the games are actually being conducted and may not exceed one dollar per hour over the State minimum hourly wage".↩
4. In its relevant part, 15 Alaska Admin. Code section 105.190 provided that: The following are grounds which will constitute a basis for the suspension, revocation or denial of permits: (1) any false statement made in an application for a permit or any report required under AS 05.15 or this chapter.↩
5. A shift consisted of 8 hours; thus, managers or supervisors were paid at a rate of $ 25 per hour ($ 200/8).↩
6. Patrons could purchase a pull tab for $ 1 or $ 2 and then rip open the back of the pull tabs to look for the combinations listed on the front. If they got the proper combination, they would win the prize. ↩
7. These adjustments for 1983 and 1984 add up to $ 825,506. No explanation was provided by the parties concerning the discrepancy between this stipulation and John Rush's finding that income had been understated by $ 810,000↩
8. Letters of proposed revocation for years after 1984 would have no relevance as to the enforcement of the statute during 1983 and 1984, which are the years at issue.↩
9. These notices to the charities were not introduced into evidence, and we are thus not aware of the basis for the proposed revocation or suspension of their permits.↩
10. The spreadsheet contains a mathematical mistake for the last quarter of 1984. The correct total for total wages paid should be $ 81,960 instead of $ 82,980. ↩
11. Upon review of the spreadsheet, we find these expenses to be $ 6,120 and $ 24,800, respectively. We also find that the managerial fee of $ 24,800 is properly deductible in 1983. ↩
12. We want to make clear that the amounts found to be adequately substantiated for 1983 and 1984 represent total amounts. From this total, wage expenses of $ 141,206 allowed on audit must be subtracted. In addition, at trial, the parties stipulated to a total deduction of $ 78,000 for bingo equipment rental attributable to the 16-month period ending on December 31, 1984. While the parties stipulated the total deduction amount of $ 78,000, they failed to indicate the amount that is properly deductible for each year. Accordingly, based on a ratable monthly allocation, we find that petitioner is entitled to deduct $ 19,500 and $ 58,500 for 1983 and 1984, respectively.↩
13. Respondent on brief does not argue that these expenses should be disallowed because they violated a "generally enforced" State law within the meaning of section 162(c)(2)↩.