FILED
United States Court of Appeals
Tenth Circuit

March 5, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HIGH DESERT RELIEF, INC., a
New Mexico non-profit
corporation,

　　　　Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,
through its agency the Internal
Revenue Service,

　　　　Defendant - Appellee.

Nos. 17-2083 & 17-2095

**Appeals from the United States District Court
for the District of New Mexico
(D.C. Nos. 1:16-CV-00469-MCA-SCY,
1:16-CV-00816-MCA-SCY,
and 1:16-CV-01255-WJ-KBM)**

James D. Thorburn (Richard Walker with him on the briefs), Thorburn
Walker, LLC, Greenwood Village, CO, for Plaintiff-Appellant.

Michael J. Haungs, Attorney, Tax Division (David A. Hubbert, Deputy
Assistant Attorney General, Tax Division; Gilbert S. Rothenberg and
Patrick J. Urda, Attorneys, Tax Division; and Robert C. Troyer, former
Acting United States Attorney, of counsel; with him on the briefs)
Department of Justice, Washington, D.C., for Defendant-Appellee.

Before **LUCERO, HOLMES**, and **EID**, Circuit Judges.

**HOLMES**, Circuit Judge.

This case arises out of the efforts of the Internal Revenue Service ("IRS") to investigate the tax liability of High Desert Relief, Inc. ("HDR"), a medical marijuana dispensary in New Mexico. The IRS began an investigation into whether HDR had improperly paid its taxes, and specifically whether it had improperly taken deductions for business expenses that arose from a "trade or business" that "consists of trafficking in controlled substances." 26 U.S.C. § 280E. Because HDR refused to furnish the IRS with requested audit information, the IRS issued four summonses to third parties in an attempt to obtain the relevant materials by other means.

HDR filed separate petitions to quash these third-party summonses in federal district court in the District of New Mexico, and the government filed corresponding counterclaims seeking enforcement of the summonses. HDR argued that the summonses were issued for an improper purpose—specifically, that the IRS, in seeking to determine the applicability of 26 U.S.C. § 280E, was mounting a de facto criminal

investigation pursuant to the Controlled Substances Act ("CSA"), 21 U.S.C. § 801, *et seq.* HDR also asserted that enforcement of § 280E was improper because an "official [federal] policy of non-enforcement" of the CSA against medical marijuana dispensaries had rendered that statute's proscription on marijuana trafficking a "dead letter" incapable of engendering adverse tax consequences for HDR. Aplt.'s Opening Br. at 30.

The petitions were resolved in proceedings before two different district court judges. Both judges ruled in favor of the United States on the petitions to quash, and separately granted the United States' motions to enforce the summonses. HDR challenges these rulings on appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

**I**

**A**

HDR is a New Mexico medical marijuana dispensary. Although such dispensaries are lawful under state law, *see* N.M. STAT. ANN. §§ 26-2B-3, 26-2B-4 (2017), "marijuana is still classified as a federal 'controlled substance' under schedule I of the CSA." *Green Solution Retail, Inc. v. United States*, 855 F.3d 1111, 1113 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1281 (2018). And this federal classification has potential tax consequences, even for businesses that are lawful under state law. In

3

particular, while 26 U.S.C. § 162(a) allows taxpayers to claim deductions for "all the ordinary and necessary expenses paid or incurred . . . in carrying on any trade or business," § 280E prohibits deductions for business expenses when the underlying business "consists of trafficking in controlled substances (within the meaning of *schedule I* and II of the [CSA]) which is prohibited by Federal law."  26 U.S.C. § 280E (emphasis added).

In February 2016, the IRS began to investigate whether HDR had taken improper deductions and thus had outstanding tax liabilities.  IRS Revenue Agent Lisa Turk provided written notice to HDR that its return for the fiscal year ending June 30, 2014 ("2014 return") had been selected for examination.  In this initial communication, Agent Turk identified several preliminary issues for inquiry (e.g., the costs of goods sold, gross receipts, and total deductions) and provided HDR with a copy of IRS Publication 1. Publication 1 outlines the IRS's audit procedures, and also explains, under a section titled "Potential Third Party Contacts," that the IRS might "sometimes talk with other persons if we need information that you have been unable to provide, or to verify information we have received."  IRS Publication 1, *Your Rights as a Taxpayer* (Rev. 9-2017),

4

https://irs.gov/pub/irs-pdf/p1.pdf.[1]

After failing to receive a response from HDR by the date specified on the notice, Agent Turk made a phone call to one of HDR's two shareholders.  During the call, the shareholder confirmed that HDR grows and sells medical marijuana to qualified patients.  At that time, Agent Turk communicated, once more, that the IRS's audit would focus on gross receipts, costs of goods sold, and all other business expenses, and then "proceeded to explain the taxpayer's rights as outlined in Publication 1." Aplt.'s App. at 340 (Mem. for the file, dated Mar. 9, 2017).

Because she was not able to obtain further information directly from HDR or its shareholders at this juncture, Agent Turk sent HDR an initial Information Document Request ("Document Request") relating to the dispensary's 2014 fiscal year.  An updated Document Request was re-issued to HDR after the audit expanded to include HDR's tax return for the fiscal year ending in June 30, 2015 ("2015 return").  Agent Turk included an additional copy of IRS Publication 1 when providing notice of the expanded

---

[1]    Though the parties did not include a copy of this publication on appeal, we may nevertheless take judicial notice of official government publications. *See Pueblo of Sandia v. United States*, 50 F.3d 856, 861 n.6 (10th Cir. 1995); *see also* FED. R. EVID. 201(b)(2) (permitting courts to take notice of a "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

audit.

Around this period, Agent Turk also attempted to schedule an interview with HDR to discuss the tax years at issue and to tour the company's facilities. HDR ultimately objected to any such contacts because of its concern that the IRS's investigation into § 280E would be equivalent to a criminal investigation under the CSA.

HDR's wariness of triggering penalties under the CSA also informed its responses to the IRS's Document Requests. In correspondence, HDR insisted that it would only "furnish documentation . . . provided that [HDR is] given assurance from the IRS, that the IRS will use the information furnished for this civil audit, and not to support the IRS's determination that the Taxpayer's business consists of illegal activities." *Id.* at 79 (Letter from Bridge West LLC to Agent Turk, dated May 23, 2016). The IRS informed HDR that it could not receive documentation under such a condition, as (1) the IRS was entitled to investigate whether § 280E applied, and (2) § 6103 of the Internal Revenue Code ("IRC")—which sets forth certain circumstances under which the IRS must disclose taxpayer material to other agencies—limited the IRS's ability to agree to HDR's conditional offer. *See* 26 U.S.C. § 6103(i). In response, HDR told Agent Turk that it "would not answer any questions, provide any records, or

6

provide . . . a tour of the business." Aplt.'s App. at 239 (Decl. of Lisa Turk, dated Oct. 21, 2016). There is no indication from the record that HDR ever sent the IRS any documents in response to either its initial, or its subsequent, Document Requests.

Employing alternative means to ascertain the correctness of HDR's 2014 and 2015 returns, the IRS issued four summonses to third parties for information allegedly pertinent to those returns. Summonses to My Bank and Southwest Capital Bank sought information concerning HDR's bank accounts. A summons to the New Mexico Department of Health's Medical Cannabis Program was aimed at HDR's financial records and statements, applications to the medical cannabis program, cannabis product descriptions, and a description of HDR's facilities. And a summons issued to the Public Service Company of New Mexico, a local electric company, requested information regarding HDR's application for service, credit data, and also billing statements regarding HDR's electricity consumption. Each time a summons was issued, HDR was provided a notice of the summons, a copy of the summons, and an explanation of HDR's right to bring a proceeding to quash the summons.

**B**

HDR first filed, in federal court, a petition to quash the summonses

that had been issued to the New Mexico Department of Health and My Bank. HDR asserted that neither summons satisfied *United States v. Powell*, 379 U.S. 48 (1964), which, as discussed *infra*, sets out the requirements for the enforcement of an IRS summons. Specifically, HDR claimed that the summonses were devoid of a legitimate purpose because they were issued in furtherance of a "pseudo-criminal investigation[] . . . to . . . convict taxpayers of violating federal criminal drug laws"—i.e., the CSA—and sought an evidentiary hearing to test the IRS's alleged good faith. Aplt.'s App. at 10 (Pet. to Quash Summonses, dated May 23, 2016).

The United States moved to dismiss HDR's petition, arguing that the IRS satisfied each of the *Powell* criteria and that the summonses were issued for the valid purpose of determining the correctness of HDR's tax returns under § 280E. On the same day that the United States filed this motion to dismiss HDR's first petition to quash, HDR filed another petition to quash, this one directed at the summons issued to the Public Service Company of New Mexico. Because the arguments contained in HDR's second petition largely mirrored those in the first, the two cases were consolidated before one district court judge.

The United States moved to dismiss the new petition regarding the Public Service Company of New Mexico, appending a declaration made by

8

Agent Turk, as well as more documentary evidence. The United States also moved to enforce the outstanding summonses against My Bank and the Public Service Company of New Mexico, but withdrew its request to enforce the summons issued to the New Mexico Department of Health, as the IRS had successfully obtained the summonsed information by means of a public records request.

At this juncture, the district court judge handling the consolidated cases gave notice that it was converting the government's motions to dismiss into motions for summary judgment pursuant to Fed. R. Civ. P. 12(d). The judge both explained her rationale—the conversion allowed her to consider the parties' supporting declarations and sundry exhibits—and afforded the parties an opportunity to present additional material. The government did not submit further filings; HDR filed a supplemental pleading arguing that "the federal drug laws which the IRS seeks to enforce through § 280E are a 'dead letter,'" and could not therefore serve as basis for the summonses at issue. Aplt.'s App. at 414, 419 (Pet'r's Supp. to Mot. for Summ. J., dated Mar. 9, 2017). In particular, HDR relied on two Department of Justice directives—the "Ogden Memo" issued in 2009, and the "Cole Memo," issued in 2013—as purported evidence of a "strong,

9

official federal policy of non-enforcement of the CSA against medical marijuana dispensaries." *Id.* at 418, 420.

While these proceedings were ongoing, HDR filed in the District of New Mexico a third and final petition to quash, this time directed at the IRS summons issued to Southwest Capital Bank. This case was assigned to another district court judge. This judge issued an order requesting that the parties show cause why the case should not be consolidated with earlier litigation filed by HDR (i.e., involving the two consolidated cases).

However, before the parties filed their responses in the Southwest Capital Bank case, the district court judge presiding over the earlier litigation granted summary judgment to the United States. The judge determined that the government carried its prima facie burden of proving the four factors set out in *Powell*, and that HDR failed to demonstrate that the IRS had issued the summonses in bad faith. In addition, the judge rejected HDR's argument that enforcement of § 280E was improper because the CSA's proscription on marijuana trafficking had become a "dead letter." The judge accordingly granted the United States' motions, entered a separate order enforcing the summons to My Bank,[2] and entered judgment.

---

[2]     While proceedings were ongoing, Agent Turk received a package from the Public Service Company of New Mexico in response to her summons
(continued...)

10

In light of the above ruling, the judge presiding over the Southwest

Capital Bank case entered an order ruling in favor of the IRS for "the same

reasons" found by the judge in HDR's earlier action, concluding that the

reasoning of the judge in the earlier action was "very persuasive authority."

Aplt.'s App. at 714 (Order, dated Apr. 11, 2017).[3]  Thereafter, the judge in

(...continued)
which provisionally obviated the need for an additional enforcement order as to
that entity.

[3]      At least nominally, the district court judge's order in the Southwest
Capital Bank case resolved an IRS motion to dismiss pursuant to Fed. R. Civ. P.
12(b)(6).  However, as noted, that judge expressly adopted wholesale the summary-
judgment analysis of the district court judge in the earlier HDR action, which took
into consideration evidentiary matters outside of the complaint.  This seems to
explain why on appeal HDR operates on the premise that the district court judge in
the Southwest Capital Bank case tacitly converted the IRS's motion to dismiss into
one for summary judgment under Fed. R. Civ. P. 56.  *See* Aplt.'s Opening Br. at
14–15 ("The two lower courts ruled (one, sua sponte), that both motions to dismiss
brought by Respondent were to be treated as motions for summary judgment, as
both parties summited [sic] documents and declarations with their pleadings and
asked the court to consider these documents."); *id.* at 36 ("The lower courts both
entered orders converting Respondent's two motions to dismiss, from Rule 12
motions to Rule 56 motions, pursuant to Fed. R. Civ. [P.] 12(d).").  Notably, HDR
does not challenge on appeal the propriety of this seemingly tacit Rule 56
conversion, or argue that we should review the district court judge's order in the
Southwest Capital Bank case under a different standard than the other judge's
earlier summary-judgment ruling.  Therefore, as explicated further *infra*, we apply
traditional summary judgment standards in reviewing both judges' orders.  *See*
*Ford v. Pryor*, 552 F.3d 1174, 1177 (10th Cir. 2008) ("In dismissing with
prejudice, the district court considered evidence beyond the pleadings, a procedure
to which Mr. Ford did not object, so we 'review the dismissal under the standard
applicable to an entry of summary judgment.'" (quoting *N. Nat. Gas Co. v. Nash*
(continued...)

the Southwest Capital Bank case entered an order enforcing the summons to that bank.

HDR has appealed from the rulings of both district court judges, and those appeals have been consolidated for our resolution.

## II

On appeal, HDR makes two overarching arguments for why we should reverse the district court judges' enforcement of the summonses and their adverse rulings on HDR's petitions to quash. First, HDR contends that the district judges misapplied the *Powell* factors. To that end, HDR attempts to refute the government's prima facie *Powell* showing and to demonstrate that the IRS's investigation did not proceed in good faith. Second, HDR argues that the district court judges erred in not applying a "dead letter rule" to the government's motions to enforce the summonses.

The resolution of both arguments turns on issues of law. We address these issues in succession and conclude (A) that the IRS met its initial

_____

(...continued)
*Oil & Gas, Inc.*, 526 F.3d 626, 629 n.1 (10th Cir. 2008))); *see also N. Nat. Gas. Co.*, 526 F.3d at 629 n.1 ("The district court considered evidence beyond the pleadings to dismiss the claim . . . ; therefore, it should have converted Nash's motion to dismiss to one for summary judgment. Northern, however, does not appeal the propriety of this procedure, so we will not reverse on this basis and will review the dismissal under the standard applicable to an entry of summary judgment." (citation omitted)).

burden to demonstrate that it acted in good faith and HDR failed to thereafter rebut that showing, and (B) that HDR's proposed "dead letter rule" has no application here. We therefore uphold the dispositive rulings of both district court judges.

## A

### 1

We review de novo the district court judges' dispositive orders granting the IRS's motions. *See Jewell v. United States*, 749 F.3d 1295, 1297 (10th Cir. 2014) (applying de novo review to the district court's grant of summary judgment to the government on its motion opposing the taxpayer's petition to quash). Further, we will not reverse a district court's denial of a petition to quash an IRS summons unless the denial amounts to an abuse of discretion. *See id.* at 1297; *accord Hopkins v. I.R.S.*, 318 F. App'x 703, 705 (10th Cir. 2009) (unpublished); *Lain v. United States*, 173 F. App'x 651, 652 (10th Cir. 2006) (unpublished); *see also Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 346 (1st Cir. 2009).

Notably, a district court necessarily abuses its discretion "when it commits an error of law." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1252 (10th Cir. 2006); *accord Westar Energy, Inc. v. Lake*, 552 F.3d 1215,

1224 (10th Cir. 2009); *see also Fox v. Vice*, 563 U.S. 826, 839 (2011) ("A trial court has wide discretion when, but only when, it calls the game by the right rules."); *United States v. Clarke*, 573 U.S. 248, 256 (2014) ("[T]he District Court's decision is entitled to deference only if based on the correct legal standard."). Because the disposition of this appeal turns on issues of law, our standard of review in considering the propriety of all of the district court judges' decisions—that is, both the decisions related to the IRS's motions and those pertaining to HDR's petitions—is, as a practical matter, de novo.[4]

---

[4]     We have, at times, evaluated whether the district court's decision to enforce a summons was clearly erroneous. *See United States v. Coopers & Lybrand*, 550 F.2d 615, 620 (10th Cir. 1977); *accord United States v. Wankel*, 475 F. App'x 273, 275 (10th Cir. 2012) (unpublished). We use the "clearly erroneous" standard in resolving *factual* disputes, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) ("In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide *factual issues* de novo." (emphasis added) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969))); *see* FED. R. CIV. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous . . . ."). Like the de novo standard of review, this deferential standard of review coexists harmoniously with an overarching abuse-of-discretion standard: just as a district court may abuse its discretion by making an error of law, which we review de novo, it can abuse its discretion by making findings of fact that we determine to be clearly erroneous. *See, e.g.*, *In re Ford*, 492 F.3d 1148, 1153 (10th Cir. 2007) ("A [ ] court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." (alteration in original) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002))); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir.

(continued...)

14

**2**

Notwithstanding the government's effort to demonstrate its satisfaction of the *Powell* factors through the vehicle of motions for summary judgment, *see supra* note 3, the government contends that "in the summons context" our authority instructs that traditional summary-judgment standards should not apply insofar as they instruct courts to view

---

[4](...continued) 2002) ("In reviewing a court's determination for abuse of discretion, we will not disturb the determination absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." (quoting *Cartier v. Jackson*, 59 F.3d 1046, 1048 (10th Cir. 1995))). The relevance of these subsidiary standards is determined by the matters at issue in a summons-enforcement proceeding. *See* Harry T. Edwards & Linda A. Elliott, FEDERAL STANDARDS OF REVIEW: REVIEW OF DISTRICT COURT AND AGENCY ACTIONS, Ch. V(A), Westlaw (database updated Feb. 2018) ("Although 'deference . . . is the hallmark of abuse of discretion review,' the variety of matters committed to the discretion of district judges means that the standard is necessarily variable. *It implies no single level of scrutiny by the appellate courts*." (emphasis added) (citation omitted) (quoting *Gen. Elec. v. Joiner*, 522 U.S. 136, 143 (1997))). Thus, the clearly erroneous standard may be relevant and have work to do when the court is obliged to resolve factual disputes in the enforcement proceeding following an evidentiary hearing. *See Coopers & Lybrand*, 550 F.2d at 617 ("[The] IRS filed its petition for judicial enforcement of the summonses . . . . A show cause order was issued and a full evidentiary hearing followed."); *Wankel*, 475 F. App'x at 274 (following the IRS's "submi[ssion] [of] a declaration from the [Revenue] officer," "[t]he district court held a hearing on the petition to enforce the summons, with the officer being called to testify for both sides"). Here, the district court judges' rulings in favor of the IRS pertain solely to issues of law—which we review de novo—and the clearly erroneous standard is thus not implicated.

the evidence in the light most favorable to the nonmovant. Aplee.'s Resp. Br. at 31. In other words, the government appears to reason that, in this context, where summary judgment in its favor would be based on a determination that it had satisfied its burden under *Powell* and would serve as the predicate for enforcing its summonses, this traditional summary-judgment principle does not apply.

The authority that the government relies on in making this argument is an unpublished decision from our court, *Villarreal v. United States*, 524 F. App'x 419 (10th Cir. 2013) (unpublished), which the district court judges here cited to support similar reasoning. Specifically, the *Villarreal* panel held that, in the summons-enforcement context, "the traditional summary judgment standards such as viewing the facts in [the taxpayer's] favor, do not apply. Instead, [the taxpayer's] burden 'is significantly more stringent than that of a party opposing a motion for summary judgment.'" *Id.* at 423 (quoting *United States v. Kis*, 658 F.2d 526, 543 (7th Cir. 1981)). HDR contests the government's *Villarreal*-based argument, arguing that there is no reason to deviate from the traditional summary-judgment framework.

We conclude that our published disposition in *Jewell* undercuts the government's argument, and, based on *Jewell*, the district court judges were

16

mistaken in relying on *Villarreal*.  In *Jewell*, we held that the traditional summary-judgment standard applies in the summons context when the taxpayer presents a challenge to the government's prima facie case under *Powell*.  *See* 749 F.3d at 1297 n.1 ("The government argues that the summary judgment standard does not apply when the government makes its prima facie case under [*Powell*].  But the issue here *is whether* the government presented a prima facie case under *Powell*." (emphasis added)).  *Jewell* thus provides the proper summary-judgment standard in this instance because, like the taxpayer in *Jewell*, HDR disputes the government's prima facie case under *Powell*.

Although the district court judges were mistaken in applying the modified summary-judgment standard that the *Villarreal* panel articulated, it is axiomatic that we may affirm on any basis that the record adequately supports.  *See, e.g.*, *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 879 (10th Cir. 2017); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006).  Accordingly, in our assessment of whether the district court judges properly entered judgment against HDR, *see infra*, we will apply traditional Rule 56 summary-judgment standards and carefully consider the record de novo.

More specifically, we will view the record in the light most favorable

17

to HDR and ask whether the IRS has shown that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. *See Jewell*, 749 F.3d at 1297. Notably, "[t]he substantive law at issue determines which facts are material in a given case." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998). Accordingly, as explicated *infra*, the substantive rubric that the Supreme Court defined in *Powell*, 379 U.S. at 57–58, is of central importance in our determination of whether there are genuine disputes of material fact here.

Notably, the traditional summary-judgment standard will not permit HDR to rest on conclusory statements in the summary-judgment record; such statements "do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998); *see Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199–1200 (10th Cir. 2000) (noting that the plaintiff's "conclusory statement" was "woefully inadequate to survive a summary judgment motion").

**3**

We now address the substantive legal framework governing the enforcement of administrative summonses. "Congress has 'authorized and required' the IRS 'to make the inquiries, determinations, and assessments of all taxes' the [IRC] imposes." *Clarke*, 573 U.S. at 249–50 (quoting 26

18

U.S.C. § 6201(a)), *accord Codner v. United States*, 17 F.3d 1331, 1332 (10th Cir. 1994). "[I]n support of that authority," Congress has given the IRS "broad latitude" to issue summonses "[f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, [and] determining the liability of any person for any internal revenue tax." *Clarke*, 573 U.S. at 250 (quoting 26 U.S.C. § 7602(a)). These summonses may be issued not only to the taxpayer being investigated, but also to third-parties who may hold relevant information. *See* 26 U.S.C. § 7602(a)(2). If a summonsed person or entity fails to comply with a summons, the IRS can bring an enforcement proceeding in a district court. *See id.* at § 7604.

However, the taxpayer is not entirely without defenses. For instance, Congress requires the IRS to give notice of a third-party summons, *id.* at § 7609(a), and has granted the taxpayer the right to petition a district court to quash such a summons. *Id.* at § 7609(b)(2). That said, in proceedings to quash a third-party summons, the government can counterclaim for enforcement. *Id.* at § 7609(b)(2)(A). The proceedings associated with these dueling motions "should be summary in nature and discovery should be limited." *United States v. Stuart*, 489 U.S. 353, 369 (1989) (quoting S. REP. NO. 97–494, Vol. I, at 285 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 781, 1031).

19

"Regardless of who initiates the action, the court follows a familiar structured analysis in a summons enforcement proceeding." *Sugarloaf Funding*, 584 F.3d at 345. As a threshold matter, the IRS must first show that it has not made a referral of the taxpayer's case to the Department of Justice ("DOJ") for criminal prosecution. *See Anaya v. United States*, 815 F.2d 1373, 1377 (10th Cir. 1987) (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298 (1978)); *see also* 26 U.S.C. § 7602(d).[5] Assuming it can make this showing, the IRS thereafter "need only demonstrate good faith in issuing the summons." *Clarke*, 573 U.S. at 250 (quoting *Stuart*,

---

[5] This showing seemingly has some overlap with the first *Powell* factor, i.e., whether the IRS had a "legitimate purpose," and the Supreme Court has occasionally bypassed this issue and only referred to the *Powell* factors, *see, e.g.*, *Clarke*, 573 U.S. at 250. However, the Supreme Court's decisions and our own appear to typically treat this criminal-referral factor as an analytically distinct issue. For instance, when speaking explicitly regarding the criminal-referral issue in *LaSalle Nat'l Bank*, the Court clearly treated this question as a distinct requirement from the *Powell* factors. *See* 437 U.S. at 318 ("[S]everal requirements emerge for the enforcement of an IRS summons. First, the summons must be issued before the [IRS] recommends to the [DOJ] that a criminal prosecution . . . be undertaken. Second, the [IRS] at all times must use the summons authority in good-faith pursuit of the congressionally authorized purposes of § 7602. This second prerequisite requires the [IRS] to meet the *Powell* standards of good faith." (footnote omitted)). Moreover, in *Anaya*, we also set this question out as a separate inquiry. 815 F.2d at 1377 (stating that "the government must first show" that no referral has been made, and it "then must show" that the *Powell* factors are met). We do not believe that *Clarke*'s recitation of the *Powell* factors without reference to this criminal-referral requirement reflects a change in the law on this point, 573 U.S. at 250, and so we continue to follow *LaSalle Nat'l Bank* and *Anaya* in viewing this as a distinct inquiry.

20

489 U.S. at 359). The IRS demonstrates good faith by establishing that:

> [1] the investigation will be conducted pursuant to a legitimate purpose, that [2] the inquiry may be relevant to the purpose, that [3] the information sought is not already within the Commissioner's possession, and that [4] the administrative steps required by the [IRC] have been followed—in particular, that the 'Secretary or his delegate,' after investigation, has determined the further examination to be necessary and has notified the taxpayer in writing to that effect.

*Powell*, 379 U.S. at 57–58. These four requirements "have become known as the *Powell* factors," *Clarke*, 573 U.S. at 250, and the IRS must make this prima facie case irrespective of which side initially brought the summons issue to court. *Compare Powell*, 379 U.S. at 57–58 (considering a petition to enforce an IRS summons), *with Jewell*, 749 F.3d at 1297–98 (applying the *Powell* framework to the taxpayer's petitions to quash summonses).

In recognition of the importance of the administrative summons as a "crucial backstop in a tax system based on self-reporting," *Clarke*, 573 U.S. at 254, the Supreme Court has instructed that we "may ask only whether the IRS issued a summons in good faith, and must eschew any broader role of 'overseeing the IRS's determinations to investigate.'" *Id.* (quoting *Powell*, 379 U.S. at 56 (alteration marks omitted)). And so the burden on the government to prove that it has not made a criminal referral to the DOJ and that it meets the *Powell* factors "is a slight one," primarily because the tax

21

code "must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted." *United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1443 (10th Cir. 1985); *accord Anaya*, 815 F.2d at 1377. Thus, "[t]he requisite showing is generally made by affidavit of the agent who issued the summons and who is seeking enforcement." *Balanced Fin. Mgmt.*, 769 F.2d at 1443 (quoting *United States v. Garden State Nat'l Bank*, 607 F.2d 61, 68 (3d Cir. 1979)); *see also Sugarloaf Funding*, 584 F.3d at 345 ("An affidavit of the investigating agent that the *Powell* requirements are satisfied is sufficient to make the prima facie case.").

Once the IRS has made out its prima facie case, "the onus of going forward shifts to the taxpayer to show enforcement of the summons would 'constitute an abuse of the court's process,' or that in issuing the summons the IRS lacks 'institutional good faith.'" *Anaya*, 815 F.2d at 1377 (quoting first *United States v. Genser*, 582 F.2d 292, 302 (3d Cir. 1978), and then *United States v. Moll*, 602 F.2d 134, 138 (7th Cir. 1979)). While we mentioned these two potential avenues of rebutting the *Powell* factors in *Anaya*, the Supreme Court has since clarified that a taxpayer may "urge the court to quash the summons 'on any appropriate ground,'" and so we do not limit HDR to the categories of argument set out in *Anaya*. *Clarke*, 573 U.S.

22

at 250 (quoting *Reisman v. Caplin*, 375 U.S. 440, 449 (1964)).

Regardless of the specific rebuttal argument made, "[t]he [taxpayer's] burden is a heavy one." *Balanced Fin. Mgmt.*, 769 F.2d at 1444; *see also Anaya*, 815 F.2d at 1378 ("[T]he [Supreme] Court declared that a taxpayer contending the [IRS] has not acted in good faith in the issuance of a summons has a heavy burden in proving his contention."). To defeat the government's prima facie case, "it is clear that a taxpayer must factually oppose the Government's allegations by affidavit. Legal conclusions or mere memoranda of law will not suffice." *Balanced Fin. Mgmt.*, 769 F.2d at 1444 (quoting *Garden State Nat'l Bank*, 607 F.2d at 71). Indeed, "[a]llegations supporting a 'bad faith' defense are . . . insufficient if conclusionary." *Id.* (quoting *Garden State Nat'l Bank*, 607 F.2d at 71).

Finally, only where the taxpayer's affidavits present a "disputed factual issue, or . . . proper affirmative defenses . . . [is] the taxpayer entitled to an evidentiary hearing." *Id.* at 1445 (quoting *Garden State Nat'l Bank*, 607 F.2d at 71). "[I]f . . . the taxpayer cannot refute the government's prima facie *Powell* showing or cannot factually support a proper affirmative defense, the district court," in the interest of judicial efficiency, "should dispose of the proceeding on the papers before it and without an evidentiary hearing." *Id.* at 1444 (quoting *Garden State Nat'l*

23

*Bank*, 607 F.2d at 71).

**4**

In applying these legal standards, we address whether the IRS has put forward sufficient evidence to satisfy its "slight" burden on both the threshold criminal-referral question and the *Powell* factors. *Balanced Fin. Mgmt.*, 769 F.2d at 1443. As we address each item, we also consider whether HDR has established a genuine dispute of material fact as to any of these requirements. We conclude both that the IRS met its initial burden and that HDR failed thereafter to rebut that evidence.

**a**

We start with the threshold matter of whether the IRS has shown "that [it] has not made a referral of the taxpayer's case to the [DOJ] for criminal prosecution." *Anaya*, 815 F.2d at 1377 (citing *LaSalle Nat'l Bank*, 437 U.S. 298). We have no difficulty concluding that the IRS has met its "slight" burden. Agent Turk's affidavits state that there was no "[DOJ] referral, as defined by 26 U.S.C. § 7602(d)" with respect to HDR or either of its shareholders for the tax periods at issue. Aplt.'s App. at 243; *id.* at 624 (Decl. of Lisa Turk, dated Jan. 17, 2017). Such an "affidavit of the agent who issued the summons and who is seeking enforcement" is sufficient to make the "[t]he requisite showing." *Balanced Fin. Mgmt.*, 769 F.2d at 1443

24

(quoting *Garden State Nat'l Bank*, 607 F.2d at 68).

As part of its discussion of the *Powell* factors, HDR alludes to the DOJ's presence in the litigation involving the summonses and the IRS's admissions that it was investigating whether § 280E applied. Aplt.'s Opening Br. at 27. But HDR offers no evidence contradicting the affidavit. This failure of proof, alone, is sufficient for us to decline to give serious consideration to any contrary argument by HDR. *See Balanced Fin. Mgmt.*, 769 F.2d at 1444 ("[I]t is clear that a taxpayer must factually oppose the Government's allegations by affidavit. Legal conclusions or mere memoranda of law will not suffice." (quoting *Garden State Nat'l Bank*, 607 F.2d at 71)). Furthermore, the mere presence of the DOJ's attorneys as advocates litigating for the enforcement of the summonses does not establish a criminal referral. *Cf. LaSalle Nat'l Bank*, 437 U.S. at 314–18 (describing robust referral processes before concluding "[n]o recommendation to the [DOJ] for criminal prosecution has been made," despite the fact that the IRS was represented by the Solicitor General's office and had been represented by the DOJ in the court of appeals, *see* 554 F.2d 302, 303 (7th Cir. 1977)). Likewise, an IRS investigation into whether § 280E applied does not tell us anything about whether it made a criminal referral to the DOJ. Thus, HDR has failed to rebut the IRS's evidence or

create a genuine dispute of material fact on this issue.

**b**

We turn next to the first *Powell* factor—that is, whether "the investigation will be conducted pursuant to a legitimate purpose." 379 U.S. at 57–58. We agree with the district court that the IRS carried its initial "slight" burden on this factor. And while HDR raises three arguments relating to this factor, none of them establish a genuine dispute of material fact.

As with the threshold referral issue, Agent Turk's statements amply demonstrate that the IRS satisfied this factor. Agent Turk declared that the investigation's purpose was to examine "*the federal tax liabilities* . . . of [HDR] . . . for the tax periods ending June 30, 2014, and June 30, 2015." Aplt.'s App. at 236–37 (emphasis added). Agent Turk also explained that the IRS issued the third-party summonses because she believed that the information requested therein "may be relevant to determ[ining] the correctness of the HDR's federal tax returns and its correct federal tax liabilities." *Id.* at 242. The summonses requested information about HDR's bank accounts, financial records and statements, electricity consumption, and general business operations. As explicated in connection with our discussion of the second *Powell* factor, *infra*, this information was all

26

relevant to whether § 280E applied to HDR, and, in turn, whether HDR had improperly taken certain deductions. Agent Turk's attestation to this effect is sufficient to establish that the IRS acted with a legitimate purpose.

In response, HDR argues that the investigation did not have a legitimate purpose because § 280E requires the IRS to conduct a *criminal* investigation, which exceeds the bounds of the agency's statutory authority. More specifically, HDR's argument proceeds in three parts. First, HDR argues that a court must conclude that the taxpayer's conduct is illegal under the federal criminal drug laws—i.e., the CSA—before § 280E can apply. Second, it contends that the IRS possesses no authority to make a determination as to the legality of the taxpayer's conduct under the CSA. Third, HDR posits that the IRS's attempt to enforce § 280E notwithstanding this lack of statutory authority reveals that its investigation is actually an illegitimate, ultra vires attempt to administer the CSA under the guise of enforcing the tax code. We address, and reject, these contentions in turn.

**i**

HDR's first proposition—that § 280E requires a predicate, judicial determination of illegality—is easily dismissed. To address this argument, we return to the relevant section of the tax code, which provides as follows:

> No deduction or credit shall be allowed for any amount paid
> or incurred during the taxable year in carrying on any trade

27

or business if such trade or business . . . consists of trafficking in controlled substances (within the meaning of schedule I and II of the [CSA]) which is prohibited by Federal law or the law of any State in which such trade or business is conducted.

26 U.S.C. § 280E. According to HDR, the IRS does not have the authority to disallow deductions under this section without an antecedent criminal conviction pursuant to the CSA. But two of our recent decisions foreclose HDR's argument. In *Green Solution*, we noted, albeit in a different procedural context, that "§ 280E has no requirement that the [DOJ] conduct a criminal investigation or obtain a conviction before § 280E applies." 855 F.3d at 1121.[6] Then, in

---

[6]    In footnote 8 of that opinion, we restricted the scope of our holding:

> To the extent Green Solution argues the IRS exceeded its authority under the [IRC], we lack subject matter jurisdiction to consider the merits of the argument. We decide here only that the IRS's efforts to assess taxes based on the application of § 280E fall within the scope of the AIA [i.e., Anti-Injunction Act].

*Green Solution*, 855 F.3d at 1121 n.8. Significantly, however, this restrictive language did not stop us in *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187 (10th Cir. 2018), from concluding that *Green Solution*'s reading of § 280E was "persuasive." *Id.* at 1196. Our reasoning in reaching this conclusion is worthy of explication. We began by recounting the procedural context and basic holding of *Green Solution*:

> Green Solution sued to enjoin the IRS from investigating Green Solution's business records in connection with an audit focused on whether certain business expenses should be denied under § 280E.

(continued...)

28

*Alpenglow Botanicals, LLC v. United States*, we applied *Green Solution*'s

"persuasive" analysis to reject a claim made by the taxpayers in that case

that is similar to the one that HDR makes here—namely that "the IRS could

not use § 280E to deny . . . deductions in the absence of a conviction from a

criminal court."  894 F.3d 1187, 1196 (10th Cir. 2018), *aff'g Alpenglow*

*Botanicals, LLC v. United States*, No. 16-CV-00258-RM-CBS, 2016 WL

7856477, at *4 (D. Colo. Dec. 1, 2016) (unpublished).  Indeed, as the

district court in *Alpenglow* stated in a helpful opinion: "If Congress had

---

(...continued)

> We concluded the Anti-Injunction Act ("AIA") prevented the court
> from exercising jurisdiction over Green Solution's "suit for the
> purpose of restraining *the assessment* or collection of any tax."

*Id.* (emphasis added) (quoting *Green Solution*, 855 F.3d at 1119).  We further
noted that "[i]n an attempt to avoid that conclusion, Green Solution [had] argued
that the AIA did not preclude the action because a determination" of whether it had
engaged in illegal drug trafficking in violation of the CSA is a matter within the
investigative purview of the United States Attorney, and therefore the IRS did not
have authority to determine whether it violated the CSA. *Id.*  As recounted in
*Alpenglow*, "[i]n rejecting this argument," the *Green Solution* panel observed that
§ 280E did not oblige the IRS to conduct a criminal investigation or to obtain a
criminal conviction before it assessed the propriety of business deductions under
§ 280E's rubric. *Id.*  In other words, as we described in *Alpenglow*, the *Green*
*Solution* panel determined that "the IRS's obligation to determine whether and
when to deny deductions under § 280E[ ] falls squarely within its authority under
the Tax Code." *Id.* (alteration in original) (quoting *Green Solution*, 855 F.3d at
1121).  All of this led the *Alpenglow* panel to reason in turn: "Although not directly
on point, our analysis in *Green Solution* is persuasive.  Alpenglow offers no reason
why we should conclude the IRS has the authority to *assess* taxes under § 280E, but
cannot *impose* excess tax liability under § 280E." *Id.*

29

wanted such an investigation to be carried out or conviction to be obtained, then it could easily have placed such language in § 280E." 2016 WL 7856477, at *4; *accord Green Solution*, 855 F.3d at 1121 (quoting *Alpenglow*, 2016 WL 7856477, at *4 in parenthetical).

As such, we break no new ground by concluding—based on the decisions of this court in *Green Solution* and *Alpenglow*, as well as the district court's persuasive opinion in the latter case—that "[§] 280E does not require that a criminal investigation be pursued against a taxpayer, or even that § 280E only applies if a criminal conviction under the CSA has been obtained." *Alpenglow*, 2016 WL 7856477, at *4. Thus, the IRS's showing as to its legitimate purpose is not undermined by want of a conviction (or criminal investigation) against HDR under the CSA.

### ii

HDR's related second contention is that the IRS lacks the institutional authority—not to mention regulatory competency—to make the requisite determinations under § 280E. *See* Aplt.'s Opening Br. at 21 (noting that "IRS has expertise only in the Tax Code, and has neither the knowledge nor the expertise to determine a violation of law outside of its jurisdiction"); Aplt.'s Reply Br. at 9 ("There has been no specific delegation of authority by Congress to the IRS to determine under what circumstances a taxpayer

violates the CSA – or other federal criminal drug laws."). In other words, HDR asserts that the IRS's authority is strictly limited to the administration and enforcement of the tax code, and, more specifically, that Congress has not delegated to the IRS the authority to determine the circumstances under which a taxpayer violates a federal criminal statute, like the CSA. According to HDR, had Congress authorized the IRS to administratively determine criminal conduct, it would have spoken "distinctly" on the issue. Aplt.'s Reply Br. at 8 (citing *United States v. Grimaud*, 220 U.S. 506, 519 (1911); *United States v. Eaton*, 144 U.S. 677, 688 (1892)).

Again, HDR faces an uphill climb for the simple reason that we have twice rejected such an argument in similar or related contexts. We held in *Alpenglow* that "it is within the IRS's statutory authority to determine, *as a matter of civil tax law*, whether taxpayers have trafficked in controlled substances." 894 F.3d at 1197 (emphasis added). And previously in *Green Solution*, we observed that "the IRS's obligation to determine whether and when to deny deductions under § 280E[] falls squarely within its authority under the Tax Code." 855 F.3d at 1121. To be sure, *Green Solution* expressly qualified this observation by noting that it was not deciding in that case whether "the IRS exceeded its authority under the [IRC]" by its "efforts to assess taxes based on the application of § 280E," because

31

directly at issue there was whether we had jurisdiction over the taxpayer's suit to enjoin those assessment efforts. *Id.* at 1121 n.8. However, just as we found *Green Solution*'s understanding of the IRS's scope of authority under the tax code—with respect to the determination of taxpayer drug-trafficking activity—"persuasive" in *Alpenglow*, we also find that understanding to be cogent here. *Alpenglow*, 894 F.3d at 1196. Thus, the reasoning of our controlling precedent in both *Alpenglow* and *Green Solution* works to fatally undercut HDR's argument here.

Furthermore, as the Supreme Court underscored in *Clarke*, Congress has "'authorized and required' *the IRS* 'to make the inquiries, determinations, and assessments of all taxes' the [IRC] imposes." 573 U.S. at 249–50 (emphasis added) (quoting 26 U.S.C. § 6201(a)). Speaking plainly and distinctly, Congress "granted the [IRS] broad latitude to issue summonses '[f]or the purpose of . . . determining the liability of any person for *any* internal revenue tax.'" *Id.* at 250 (emphasis added) (quoting 26 U.S.C. § 7602(a)).

Because one of the requisite determinations to ascertaining the full scope of a taxpayer's tax liability is the § 280E question of whether the taxpayer trafficked in controlled substances, it follows that Congress, in § 6201(a), has necessarily authorized the IRS to make that determination.

As the district court in *Alpenglow* observed:

> Section 280E is placed in the *Internal Revenue* Code, and instructs that deductions should be disallowed if certain circumstances exist in a taxpayer's business. It would certainly be strange if the *Internal Revenue* Service was not charged with enforcing that provision. The fact that selling marijuana may also constitute a violation of the CSA is simply a byproduct of § 280E using the CSA's definition of "controlled substances."

*Alpenglow*, 2016 WL 7856477, at *4. In other words, the IRS does not exceed its statutory authority by making a determination that Congress expressly asked it to make—even if that determination requires the IRS to ascertain whether the taxpayer is engaged in conduct that could subject him or her to criminal liability under the CSA. As we noted in our own *Alpenglow* decision, this view of the IRS's authority is far from novel; "other courts have upheld tax deficiencies against state-sanctioned marijuana dispensaries based on application of § 280E, without questioning the IRS's authority on this issue." *Alpenglow*, 894 F.3d at 1196 (collecting cases).

Moreover, it is noteworthy that the IRC in other instances requires the IRS to determine whether a taxpayer has engaged in unlawful conduct as part of its tax assessment and collection duties. *See* 26 U.S.C. § 162(c)(1) (disallowing business deductions for the taxpayer's payments to government officials "if the payment constitutes an illegal bribe or kickback or, if the

33

payment is to an official or employee of a foreign government, [when] the payment is unlawful under the Foreign Corrupt Practices Act of 1977," and placing the burden on the Treasury Secretary or its *delegate*, *see* 26 U.S.C. § 7701(a)(11)(B), to establish that the payment was in fact unlawful "*for the purposes of this paragraph*" (emphasis added)); 26 U.S.C. § 6663 (imposing a civil tax penalty for a taxpayer's underpayment if such underpayment "is due to fraud" which may be established by the Treasury Secretary or *its delegate*, *see* 26 U.S.C. § 7701(a)(11)(B)).

We acknowledge a related, late-blooming argument made by HDR. This argument, based on HDR's reading of *Leary v. United States*, 395 U.S. 6 (1969), is waived because, while it was raised in HDR's reply brief and Rule 28(j) letter, it was not mentioned in its opening brief. *See Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1227 n.6 (10th Cir. 2017) ("[I]ssues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived." (quoting *Wheeler v. Comm'r*, 521 F.3d 1289, 1291 (10th Cir. 2008))); *Flores-Molina v. Sessions*, 850 F.3d 1150, 1172 n.16 (10th Cir. 2017) ("It is well established that we will not consider issues raised for the first time in a Rule 28(j) letter." (alteration omitted) (quoting *Thacker v. Workman*, 678 F.3d 820, 842 (10th Cir. 2012))).

However, even were we to excuse that waiver, the argument would

34

fail on the merits. HDR relies on *Leary* and related Supreme Court decisions for the proposition that "[i]f Congress delegates its tax power to allow the IRS to investigate inherently criminal activity for tax administration purposes, it must . . . (1) [p]rohibit the IRS from sharing the incriminating information with law enforcement; or (2) [p]rovide absolute immunity from prosecution." Case No. 17-2083, Aplt.'s Supp. Authority at 1–2, No. 10540166 (10th Cir., filed Mar. 2, 2018) (emphasis omitted). Without these procedural restrictions, as the argument goes, there would be a constitutional difficulty in vesting administrative agencies with the power to investigate facts with criminal implications. But we have previously rejected a similar argument. *See Alpenglow*, 894 F.3d at 1197 (rejecting the taxpayer's attempt to rely on the *Leary* line of cases and concluding that "th[o]se decisions do not prohibit the IRS from applying § 280E to deny . . . deductions").

Moreover, the cited Supreme Court cases are inapposite, as they were predicated on natural-person taxpayers' "invocation of the privilege against self-incrimination." *Id.*; *see, e.g.*, *Marchetti v. United States*, 390 U.S. 39, 41–49, 60–61 (1968) (concluding that natural-person taxpayer's invocation of the Fifth Amendment privilege barred prosecution under federal wagering tax statutes requiring taxpayers, *inter alia*, to register with the

35

IRS their compliance with said statutes); *Leary*, 395 U.S. at 15, 27 (holding

the same with respect to conviction of a natural-person taxpayer for

violating a marijuana tax law that obligated the taxpayer to file a written

order form with the IRS detailing the amount of marijuana received). HDR,

however, is not a natural-person taxpayer and, consequently, has no Fifth

Amendment privilege that it can properly invoke.[7] *See Braswell v. United*

*States*, 487 U.S. 99, 104–05 (1988) (stating that "we have long recognized

that, for purposes of the Fifth Amendment, corporations and other

collective entities are treated differently from individuals," and that it is

"settled that a corporation has no Fifth Amendment privilege"); *United*

*States v. Richardson*, 469 F.2d 349, 350, 352 (10th Cir. 1972) ("[W]e hold

that Richcon Enterprises, Inc. ['treated for tax purposes under the

provisions of Subchapter S'] has retained its corporate character, and

---

[7]     In any event, even if HDR could avail itself of a Fifth Amendment privilege (which it cannot), it would lend no meaningful succor to HDR in seeking to avoid disallowance of its business expenses under § 280E. In this regard, we have recently rebuffed the "contention" of natural-person taxpayers who were shareholders of a business that the state had licensed to sell medical marijuana "that bearing the burden of proving the IRS erred in rejecting [their company's] business deduction under § 280E violated the Taxpayers' Fifth Amendment privilege." *Feinberg v. Comm'r* ("*Feinberg II*"), --- F.3d ----, 2019 WL 926088, at *6 (10th Cir. 2019). We observed that "[t]he Taxpayers fail to explain how requiring them to bear the burden of proving the IRS erred in applying § 280E to calculate their civil tax liability is a form of compulsion equivalent to a statute that imposes criminal liability for failing to provide information subjecting the party to liability under another criminal statute." *Id.* at *5. And we concluded that in fact such a "burden is not 'compulsion' for purposes of the Fifth Amendment." *Id.* at *6.

36

therefore its records are not within the ambit of [a stockholder's] Fifth Amendment privilege"); *Amato v. United States*, 450 F.3d 46, 48 n.2 (1st Cir. 2006) (noting that "corporations and collective entities have no Fifth Amendment privilege against self-incrimination"). Indeed, as in *Alpenglow*, HDR wisely "has not raised a Fifth Amendment challenge on appeal." *Alpenglow*, 894 F.3d at 1197. Thus, the *Leary* line of cases is inapposite here. Furthermore, akin to *Alpenglow*, HDR is relying on these cases to question the propriety of vesting the IRS with the "*authority* to tax based on its conclusion that the taxpayer is engaged in illegal conduct," whereas the *Leary* line of cases evinced a "challenge[] to 'the *methods* employed by Congress' in enforcing these [tax] statutes, not the *authority* of the IRS to investigate and tax illegal activity." *Id.* (citation omitted) (quoting *Marchetti*, 390 U.S. at 44). Accordingly, even were we to put aside any waiver concerns, HDR's *Leary*-related contentions explicated above would fail on the merits.

In a variation on this theme, HDR further argues that Congress's repeal, after *Leary*, of the Narcotics Drugs Import and Export Act and Marijuana Tax Act "shows that Congress took away any IRS authority to investigate and find violations of federal criminal drug laws." Aplt.'s Reply Br. at 9. According to HDR, *Leary* and the subsequent repeal of

37

these statutes militate against the conclusion that Congress would have, in § 280E, given to the IRS the "authority to investigate and administratively determine that a person has violated federal criminal drug laws – even for the determination of tax liability." *Id.* at 11. This argument, too, is waived because HDR raises it for the first time in its reply brief. *See, e.g.*, *Medina*, 877 F.3d at 1227 n.6.

Even if HDR could overcome this waiver obstacle, we would still conclude that the argument is misguided. As the district court in *Alpenglow* observed, "§ 280E provides the IRS with the authority to make the *factual determinations* necessary to decide whether that provision applies to a taxpayer's trade or business," and no more. 2016 WL 7856477, at *4 (emphasis added). Congress can authorize the IRS to make an administrative determination that the taxpayer regularly bought or sold marijuana during the course of its business without simultaneously authorizing the IRS to determine, for purposes of imposing criminal liability, whether the taxpayer violated federal drug laws. *Cf. Apenglow*, 894 F.3d at 1196 (noting that "[a]t the core of Alpenglow's argument is the *assumption* that a determination a person trafficked in controlled substances under *tax* law is essentially the same as a determination the person trafficked in controlled substances under *criminal* law," and showing that

assumption to be mistaken (first emphasis added)). And that's exactly what Congress did in enacting § 280E.

In sum, none of HDR's arguments provide us with a persuasive reason for straying, in the context of the IRC, from our observation in *Green Solution* that "the IRS's obligation to determine whether and when to deny deductions under § 280E[] falls squarely within its authority under the Tax Code." 855 F.3d at 1121. We agree with the district court that the IRS in fact "has the authority to investigate whether a party is trafficking in controlled substances in order to apply Section 280E." Aplt.'s App. at 438 (Order, dated Mar. 31, 2017). HDR does not succeed in creating a genuine dispute of material fact about the IRS's good faith on this ground.

### iii

Finally, in its third bid to undermine the government's showing on the first *Powell* factor, HDR argues that the IRS proceeded without a legitimate purpose because it sought to "apply[] the criminal penalty imposed by the statute." Aplt.'s Opening Br. at 22. According to HDR, under the guise of a routine civil audit intended to effectuate § 280E, the IRS was actually engaging in a backdoor enforcement of the CSA. The evidence, however, simply fails to show that the IRS was focused on criminal prosecution in its investigation of HDR. On this point, we agree with the district court that,

39

"though HDR *characterizes* the investigation here as criminal or pseudo-criminal . . . HDR alleges no *facts* by which this Court could conclude that the IRS was investigating a purported violation of the CSA for purposes of a criminal investigation." Aplt.'s App. at 434.

HDR's contentions to the contrary are unavailing. HDR asserts that "statements made by Ms. Turk[] indicate the [IRS's] true purpose is *not* simply to routinely audit [HDR's] tax returns." Aplt.'s Opening Br. at 22 (emphasis added). However, HDR fails to identify Agent Turk's ostensibly problematic comments. Yet, as the appellant, it is clearly HDR's burden to do so. *See United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997) ("refus[ing] to determine the prejudicial effect, if any, of the uncited evidence"); *accord WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 692 n.12 (10th Cir. 2015); *see also Schaede v. Boeing Co.*, 72 F.3d 138, at *1 (10th Cir. 1995) (unpublished table decision) (noting that "it is the appellant's responsibility to tie the salient facts, supported by specific record citation, to [its] legal contentions"). In any event, our independent study of Agent Turk's declarations reveals no such problematic statements. Therefore, we decline to give credence to HDR's contentions.

HDR also alleges that statements made by the IRS during the course

40

of the litigation suggest that the IRS's investigation was motivated by an "improper purpose (to investigate violation of a criminal statute, . . . the [CSA])." Aplt.'s Opening Br. at 13. In particular, HDR contends that the distinction that the IRS purports to draw between "mak[ing] determination[s] about whether [a] business illegally trafficked in Schedule [I] substances" for tax purposes, on the one hand, and enforcing the criminal aspects of the CSA, on the other, is untenable. *Id.* at 24 (citing Aplt.'s App. at 140–41 (Aplee.'s Mot. to Dismiss Pet. to Quash, dated Jul. 13, 2016)). According to HDR, the IRS's contention that it may "make independent determinations regarding illegal activity" indicates that the IRS is, in effect, enforcing the CSA. *Id.* (citing Aplt.'s App. at 142).

We are unpersuaded. HDR fails to present any evidence that the IRS has operated with criminal prosecution in mind. For one, as Agent Turk stated in her declarations, the IRS had not referred the matter to the DOJ for prosecution under the CSA. For another, there is no plausible reading of the record that would indicate that HDR had in fact been investigated, charged, or prosecuted criminally under the CSA for business activities stemming from fiscal year 2014 or 2015. Even the traditional summary-judgment standard cannot save HDR from the adverse legal consequences of such bald averments unsupported by evidence. On the contrary, the record

indicates, as the district court found, that the IRS proceeded on its own investigation in this matter with the sole object of ascertaining HDR's tax liability.

In sum, we agree with the district court that there is no indication in the record that the IRS investigated HDR with an illegitimate purpose.

c

In satisfaction of the second *Powell* factor, whether "the inquiry [is] relevant to the [legitimate] purpose," 379 U.S. at 57–58, Agent Turk explained how each of the four summonses were relevant to the investigation. Specifically, the information sought from the New Mexico Department of Health would be used to determine whether HDR was growing or selling marijuana, and to substantiate gross receipts and income information. The information sought from the Public Service Company of New Mexico, concerning electricity use, would help to determine the amount of marijuana grown during the fiscal years under investigation, which would, in turn, substantiate gross receipts. The bank account information sought from My Bank and Southwest Capital Bank also would be used to substantiate gross receipts and income information. Agent Turk's affidavit satisfies the IRS's "slight" burden. Because HDR puts

42

forward no further argument or evidence on this factor, we conclude that there is no genuine dispute of material fact here.

**d**

As to the third *Powell* factor, whether "the information sought is [] already within the Commissioner's possession," *Powell*, 379 U.S. at 57–58, Agent Turk stated that the IRS did not already possess the information sought and had not received the documents it had requested from HDR pursuant to its repeated Document Requests. Aplt.'s App. at 239 ("To date, HDR has not responded to [Document Requests] 1 or 2 or provided any information to substantiate the figures shown on its tax returns for the periods ending June 30, 2014, and June 30, 2015.").[8] This statement satisfies the IRS's initial burden.

HDR responds by arguing that it had offered the IRS the summonsed documents—albeit conditionally—and so the documents should be considered "constructively in control" of the IRS. Aplt.'s Opening Br. at

---

[8] In the interest of completeness, two matters are worthy of mention here. First, as the district court explained, the IRS was ultimately able to obtain the information sought from the New Mexico Department of Health through a public records request, and thereafter withdrew its request to enforce that summons. Second, Agent Turk stated in her declaration that she had received a bundle of documents in response to her summons to the Public Service Company of New Mexico, but that she would decline to open the package while HDR's petition to quash remained pending. Notably, HDR makes no argument that either of these events is relevant to our analysis of the third *Powell* factor.

13. HDR further argues that the IRS's rejection of its conditional tender of the requested materials "casts doubt upon its stated limited purpose of merely 'determining [the] correctness of HDR's tax return.'" *Id.* at 27.

We begin by noting that nothing in the record indicates that HDR ever physically furnished the IRS with the information it sought. Indeed, Agent Turk specifically stated that the IRS was not in possession of the materials it requested from HDR. Although HDR's briefing conclusorily suggests that Agent Turk's testimony does not tell the full story, HDR fails to cite to any part of the record as proof that it did in fact deliver the requested materials to the IRS. The burden of disproving the government's prima facie showing "rests squarely on the taxpayer," *Balanced Fin. Mgmt.*, 769 F.2d at 1444 (quoting *Kis*, 658 F.2d at 538–39), and HDR has not adequately carried its burden on this point, *see id.* ("[I]t is clear that a taxpayer must factually oppose the Government's allegations by affidavit. Legal conclusions or mere memoranda of law will not suffice." (quoting *Garden State Nat'l Bank*, 607 F.2d at 71)).

Nor does HDR get credit for "constructively" complying with the IRS's Document Requests. As the district court observed, HDR's "offer" to release information to the IRS came with significant strings attached. Prior to the issuance of the summonses, HDR agreed to

"furnish documentation . . . provided that [HDR is] given assurance from the IRS, that the IRS will use the information furnished for this civil audit, and not to support the IRS's determination that the Taxpayer's business consists of illegal activities." Aplt.'s App. at 79. An IRS attorney responded that the IRS did not have the authority to agree to HDR's conditions, as the IRS was bound by 26 U.S.C. § 6103(i), which requires the IRS to turn tax-return documents over to other agencies in certain circumstances.

On appeal, the government argues that HDR's "condition was a plain attempt to preclude the IRS's investigation as to Section 280E," which the IRS was authorized to conduct. Aplee.'s Resp. Br. at 47. Be that as it may, what is patent is that HDR's conditional offer to furnish the documents put the IRS in an objectionable and unsuitable position. And, contrary to HDR's suggestion—*see* Aplt.'s Opening Br. at 13 (noting that "[t]he necessary documents requested were originally tendered [to the IRS] by [HDR's] representative" and "are available and constructively in control of the IRS")—its conditional offer was not tantamount to placing the documents in the IRS's constructive possession in satisfaction of *Powell*'s third factor. The IRS was "under no obligation to circumscribe its examination—or to ignore statutory complications—in order to obtain

relevant documents." Aplee.'s Resp. Br. at 47.

HDR further argues that the IRS could have given it "use immunity"[9] pursuant to 18 U.S.C. § 6004,[10] and so the IRS's protestation that it did not

_____

[9] *See, e.g., United States v. Fishman*, 645 F.3d 1175, 1185 n.6 (10th Cir. 2011) ("Use immunity 'confers immunity [with regard to possible criminal prosecution] only against the use of testimony compelled under the immunizing order; it does not confer transactional immunity under which the witness could not be prosecuted at all for the transactions about which he testifies.'" (quoting *In re Madison Guar. Sav. & Loan*, 352 F.3d 437, 443 (D.C. Cir. 2003) (per curiam))); *Use Immunity*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Immunity from the use of compelled testimony (or any information derived from that testimony) in a future prosecution against a witness."); *see also United States v. Schmidt*, 816 F.2d 1477, 1480–81 (10th Cir. 1987) (discussing the act-of-production doctrine, whereby "the act of producing the subpoenaed documents would involve testimonial self-incrimination").

[10] In pertinent part, this statute provides:

> (a) In the case of any individual who has been or who may be called to testify or provide other information at any proceeding before an agency of the United States, the agency may, with the approval of the Attorney General, issue, in accordance with subsection (b) of this section, an order requiring the individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination . . . .

> (b) An agency of the United States may issue an order under subsection (a) of this section only if in its judgment--

>> (1) the testimony or other information from such individual may be necessary to the public interest; and

>> (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

(continued...)

46

have the authority to accept HDR's proposed conditions was legally erroneous. Aplt.'s Opening Br. at 25–26. HDR seems to reason that the IRS has constructive possession of the documents because, if it granted "use immunity" to HDR, HDR would have been willing to turn the documents over. However, even assuming that the IRS is "an agency of the United States" within the meaning of § 6004, and thus authorized under certain circumstances to grant "use immunity," and even assuming that it could confer such immunity on a corporation like HDR, the IRS could not do so without "the approval of the Attorney General." 18 U.S.C. § 6004(a). Therefore, the IRS would not have been entirely free of its own accord to comply with HDR's conditions. Furthermore, even if the IRS *could* have granted HDR "use immunity," HDR cites no legal authority that indicates that the IRS was *required* to do so to secure HDR's compliance with its Document Requests. In sum, we are not persuaded that any ostensible power that the IRS possessed to grant HDR "use immunity" gave it constructive possession over the documents it sought from HDR.

We thus agree with the district court that the IRS satisfied the third *Powell* factor. HDR has not demonstrated the existence of a genuine

---

(...continued)
18 U.S.C. § 6004.

47

factual dispute that the IRS did not have the sought-after information in its possession.

e

Finally, we conclude that the fourth *Powell* factor—which requires the IRS to prove that it "followed" "the administrative steps required by the [IRC]," *Powell*, 379 U.S. at 58—is satisfied here. To meet this requirement, the IRS must comply with the procedures outlined in § 7602(c), requiring it to give "reasonable notice in advance to the taxpayer that contacts with persons other than the taxpayer may be made." 26 U.S.C. § 7602(c)(1). In this regard, Agent Turk's declarations establish that proper notice was provided to HDR. Her declarations explain how she twice sent HDR copies of IRS Publication 1, which informs the taxpayer, under a section entitled "Potential Third Party Contacts," that the IRS will "sometimes talk with other persons if we need information that you have been unable to provide, or to verify information we have received."

Several district courts have concluded that IRS Publication 1 provides sufficient notice to satisfy § 7602(c). *See, e.g.*, *Gangi v. United States*, 2 F. Supp. 3d 12, 21–22 (D. Mass. 2014), *aff'd*, 638 F. App'x 16 (1st Cir. 2016) (unpublished); *Bible Study Time, Inc. v. United States*, 240 F. Supp. 3d 409, 422–23 (D.S.C. 2017). We acknowledge that the Ninth Circuit has recently

48

held that IRS Publication 1 did *not* provide sufficient notice to satisfy

§ 7602(c) based on the circumstances of the case before it but noted that

Publication 1 might provide sufficient notice in other circumstances. *See*

*J.B. v. United States*, --- F.3d ----, 2019 WL 923717 at *1 (9th Cir. 2019)

("We reject a categorical approach to this question. We conclude that

'reasonable notice in advance' means notice reasonably calculated, under

all the relevant circumstances, to apprise interested parties of the

possibility that the IRS may contact third parties, and that affords interested

parties a meaningful opportunity to resolve issues and volunteer

information before third-party contacts are made."). However, HDR does

not dispute that IRS Publication 1 provided the notice required by §

7602(c)(1). Therefore, for purposes of assessing whether the IRS satisfied

the notice requirement here, we assume without deciding that Publication 1,

in substance, did provide sufficient notice under § 7602(c)(1).

However, HDR appears to argue that the IRS ran afoul of *Powell* by

sending IRS Publication 1 prior to its "investigation" and determination

that further examination was necessary. *See* Aplt.'s Opening Br. at 28

("The use of Publication 1 sent early i[n] the proceedings prior to

investigation is insufficient."). But we reject this argument because the

IRS gave HDR advance notice of potential third-party contacts multiple

49

times, including after the investigation was underway. In addition to the initial copy of IRS Publication 1 that Agent Turk sent on February 1, 2016, Agent Turk also explained the contents of "taxpayer's rights as outlined in Publication 1" in a subsequent telephone conference with one of HDR's shareholders, during which she informed the shareholder that HDR was under audit and that the IRS believed that information as to HDR's costs of goods sold, gross receipts, and total deductions were necessary to its inquiry. Aplt.'s App. at 340. Moreover, the IRS investigation was well underway by the time IRS Publication 1 was again transmitted to HDR in May of 2016.

Thus, we conclude the district judges correctly determined that there is no genuine dispute of material fact concerning whether the IRS complied with the requirement of § 7602(c)(1)—and thereby satisfied *Powell*'s fourth factor—to provide reasonable notice in advance that it may contact persons other than HDR.

*** 

In light of the above, the district judges correctly concluded that "the United States demonstrated a prima facie case that it acted in good faith as required by *Powell*." Aplt.'s App. at 438. In response, HDR has not borne its "heavy burden" of rebutting this showing, *Balanced Fin. Mgmt.*, 769

50

F.2d at 1449; it has not "point[ed] to specific facts or circumstances plausibly raising an inference of bad faith." *Clarke*, 573 U.S. at 254. And because HDR's affidavits did not present a "disputed factual issue, or . . . proper affirmative defenses," *Balanced Fin. Mgmt.*, 769 F.2d at 1445 (quoting *Garden State Nat'l Bank*, 607 F.2d at 71), the district judges rightly denied an evidentiary hearing. *See Stuart*, 489 U.S. at 369 ("[S]ummons enforcement proceedings should be summary in nature and discovery should be limited." (alteration in original) (quoting S. REP. NO. 97–494, Vol. I, at 285 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 781, 1031). Because there is no genuine dispute of material fact, we conclude that the district judges properly entered summary judgment in favor of the IRS.

**B**

HDR alternatively contends that the IRS cannot deny HDR deductions for its ordinary and necessary business expenses because the underlying public policy that § 280E purports to vindicate as to marijuana trafficking—that is, the policy regarding marijuana trafficking embodied in the CSA—is a "dead letter." We disagree. First, we set the stage with some background information regarding the role of public policy in the tax-deduction context. Second, we reject HDR's argument that the presumption

51

against judicially-recognized public policy exceptions applies to § 280E. And, third and lastly, we express our disagreement with HDR's suggestion that the DOJ's ostensible policy of non-enforcement of CSA in the marijuana context could render that statute's proscription of marijuana trafficking a "dead letter."

**1**

As previously noted, taxpayers are generally permitted to claim deductions for "all the ordinary and necessary expenses paid or incurred . . . in carrying on any trade or business." 26 U.S.C. § 162(a). However, courts have recognized a public policy exception to this general rule: "A finding of 'necessity' cannot be made . . . if allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof." *Tank Truck Rentals, Inc. v. Comm'r*, 356 U.S. 30, 33 (1958) (citing *Comm'r v. Heininger*, 320 U.S. 467, 473 (1943)). But this exception has been tightly circumscribed, with the Supreme Court articulating a presumption against the public policy exception that counsels the IRS "against invoking public-policy exceptions to the Code too freely." *Estate of Petter v. Comm'r*, 98 T.C.M. (CCH) 534, at *12 (T.C. 2009) (describing the effect of *Comm'r v. Tellier*, 383 U.S. 687 (1966)), *aff'd*, 653 F.3d 1012

(9th Cir. 2011).

This presumption arose out of an understanding that the tax code should not be used as a "mandate for extirpating evil," and that liberal application of the public policy exception "would result in a tax on gross rather than net income, and thus be 'inconsistent with a tax system geared to the latter concept.'" *Dixie Mach. Welding & Metal Works, Inc. v. United States*, 315 F.2d 439, 441 (5th Cir. 1963) (quoting *Business Expenses, Disallowance, and Public Policy: Some Problems of Sanctioning with the Internal Revenue Code*, 72 YALE L.J. 108, 112, 114 (1962)); *cf. Tank Truck*, 356 U.S. at 33 (observing that the presumption effectuates Congress's "broad basic policy of taxing 'net not . . . gross, income'" (quoting *McDonald v. Comm'r*, 323 U.S. 57, 66–67 (1944))). To overcome the presumption, the "frustration [of public policy] resulting from allowance of the deduction" must be "sever[e] and immedia[te]." *Tank Truck*, 356 U.S. at 35.

**2**

HDR acknowledges that § 280E is a public policy exception to the general background rule of § 162(a) that permits deductions for trade and business expenses, but it argues that § 280E should no longer be recognized in the marijuana context because the public policy it serves—purportedly, a

53

public policy against marijuana trafficking—has lessened over time and become a "dead letter." Under the logic of HDR's argument, given the "dead letter" status of the policy against marijuana trafficking, there would be no frustration of public policy if companies, like HDR, were permitted to take their business-expense deductions. Consequently, reasons HDR, the presumption against the public policy exception should be given full effect here and HDR should be allowed its deductions.

More specifically, by HDR's reckoning, both the DOJ and Congress have de-prioritized enforcement of the CSA with regard to marijuana trafficking. Therefore, no public policy would be frustrated if the IRS simply overlooked marijuana dispensaries in its administration of § 280E. In support of this contention, HDR points to the "Ogden Memo," and "Cole Memo," in which two consecutive Deputy Attorneys General encouraged federal prosecutors to decline prosecutions of state-regulated marijuana dispensaries in most circumstances.[11]

HDR also refers to Congress's appropriations bills for fiscal years 2015 and 2016 as evidence of Congress's intent not to seek enforcement of

---

[11] *See* Memorandum from David W. Ogden, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for Selected United States Attorneys (Oct. 19, 2009), *revised by* Memorandum from James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for all United States Attorneys (Aug. 29, 2013).

the CSA in states that have legalized certain marijuana-related activities. These bills prevented the DOJ from using appropriated funds to stop states that legalized marijuana "from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana."  Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113–235, 128 Stat. 2130, 2217 (2014); *see also* Consolidated Appropriations Act, 2016, Pub. L. No. 114–113, 129 Stat. 2242, 2332–33 (2015).

The government, for its part, has countered with a more recent memorandum from then-Attorney General Jeff Sessions that rescinded the Ogden and Cole memos, to support its position that the federal policy against marijuana trafficking embodied in the CSA was never a "dead letter."  *See* Memorandum of Att'y Gen. Jefferson B. Sessions Regarding Marijuana Enforcement (Jan. 4, 2018).[12]

HDR's argument here fails because it is clear that the presumption against public policy exceptions cannot be applied to § 280E.  As the

---

[12]    In November 2018, following briefing and oral argument in this case, Jefferson B. Sessions resigned from his post as Attorney General, was replaced on an acting basis by Matthew G. Whitaker, and then replaced on a permanent basis by William P. Barr.  The parties have not informed us of any action by the DOJ to rescind or materially alter the referenced Sessions memo, and we are not aware of any such action.

Supreme Court has held, the presumption against public policy exceptions applies only where "Congress has been wholly silent" as to whether deductions should be disallowed as a matter of public policy. *Tellier*, 383 U.S. at 693–94. Absent this circumstance, "[d]eductions . . . may . . . be disallowed by specific legislation, since deductions 'are a matter of grace and Congress can, of course, disallow them as it chooses.'" *Id.* (quoting *Comm'r v. Sullivan*, 356 U.S. 27, 28 (1958)). Indeed, "[s]pecific legislation denying deductions for payments that violate public policy is not unknown." *Id.* at 693 n.10. Section 280E is precisely such a congressional disallowance by specific legislation.

Like the provisions cited by the *Tellier* Court, 383 U.S. at 693 n.10 (referencing, *inter alia*, § 162(c) (providing disallowance of deductions for certain unlawful bribes), and § 165(d) (restricting wagering deductions to the extent of wagering gains)), § 280E is a formal expression of federal public policy—or, put another way, a codification of a public policy exception—regarding drug trafficking activities that the CSA condemns. Those condemned activities include marijuana trafficking. *See Californians Helping to Alleviate Med. Problems, Inc. v. Comm'r*, 128 T.C. 173, 181 (T.C. 2007); *see also Alpenglow*, 894 F.3d at 1206 ("Congress has not been silent here; by enacting § 280E, Congress has spoken expressly on its intent

56

to prohibit the deduction of business expenses related to drug trafficking illegal under federal law."). The Senate Finance Committee report accompanying § 280E makes the connection explicit. *See* S. REP. NO. 97–494, Vol. 1, at 309 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 781, 1050 (noting that "[t]here is a sharply defined public policy against drug dealing," and that deductions for drug-related business expenses "must be disallowed on public policy grounds").

By codifying through specific legislation the federal public policy against the allowance of business expenses for certain drug-trafficking activity that the CSA condemns—including marijuana trafficking—Congress necessarily rendered the presumption against the operation of the public policy exception inapplicable in this context. *See Tellier*, 383 U.S. at 693. In other words, the common-law presumption disfavoring public policy exceptions does not apply to § 280E. *See Alpenglow*, 894 F.3d at 1206 (concluding the same).

**3**

In resisting this outcome, HDR relies on a 1964 district court case from Alabama, *Sterling Distribs. v. Patterson*, 236 F. Supp. 479 (N.D. Ala.

1964).[13]  In *Sterling Distributors*, the IRS attempted to disallow deductions for costs the taxpayer incurred in providing free beer as part of its promotional campaign; at the time, Alabama had statutes which outlawed such conduct.  *Id.* at 482.  The district court, however, found for the taxpayer and denied the disallowance after it determined that the Alabama statutes in question had fallen into desuetude and become, in effect, a "dead letter."  *Id.* at 483–84 ("It would be an apparent anachronism for this court now to hold that the expenses actually incurred by plaintiff in carrying on [its] . . .  business violate or frustrate the public policy of the State of Alabama . . . [when] the State, through its authorized officers, long ago determined [that the public policy] should not be enforced.").

*Sterling Distributors*, however, is clearly not binding on us, and, furthermore, is readily distinguishable.  There, Congress had been silent as to whether costs associated with providing free beer in (technical) contravention of state law were properly deductible under § 162(a), thus

---

[13]      Besides *Sterling Distributors*, the only case that HDR cites that purportedly applied a "dead letter" doctrine is *Brown v. Comm'r*, 63 T.C.M. (CCH) 1866 (T.C. 1992).  But in that case the tax court was addressing 26 U.S.C. § 162(c)(2), which critically prevents deductions for bribes that are made illegal by state law "*only* if such State law is *generally enforced*."  *Id.* (emphasis added). This unique statutory provision then does not support a more generalized "dead letter rule" based on non-enforcement—particularly with respect to § 280E, which has no analogous language that makes its application turn on whether the federal Executive Branch generally enforces the CSA.

providing the court with "flexib[le]" discretion to determine whether a public policy exception should apply. 236 F. Supp. at 482 (quoting *Tank Truck*, 356 U.S. at 35); *see also Alpenglow*, 894 F.3d at 1206 ("[T]he Supreme Court has held that a public policy analysis on the disallowance of deductions under the Tax Code is only appropriate 'where Congress has been wholly silent[.]" (quoting *Tellier*, 383 U.S. at 693)). And, in applying this discretion, the court considered the fact that the Alabama statute in question had not been enforced. Here, however, there is no such silence, and thus no discretion for a court to engage in an analysis to determine whether or not a public policy exception should apply.[14] Congress has expressly determined that such an exception *does* apply, and it is embodied in § 280E. Specifically, Congress, through § 280E, has expressly disallowed the deductions in question, i.e., deductions of business expenses when the underlying business "consists of trafficking in controlled substances (within the meaning of schedule I and II of the [CSA]) which is prohibited by Federal law." 26 U.S.C. § 280E. *See also Alpenglow*, 894 F.3d at 1206 (similarly distinguishing *Sterling Distributors* on the ground

---

[14] Therefore, we have no occasion to opine here on whether—as in *Sterling Distributors*—the nonenforcement of a statutory proscription could be a proper variable in any such public policy exception analysis.

that, unlike in that case, "Congress has not been silent *here*; by enacting §

280E, Congress has spoken expressly on its intent to prohibit the deduction

of business expenses related to drug trafficking illegal under federal law"

(emphasis added)).

Furthermore, even if we could elide Congress's clear statement of

public policy embodied in § 280E and thus open the discretionary door to

consideration of a purported "dead letter" rule—which we cannot—there is

reason to seriously question whether such a rule would have any space to

operate in this context. *Cf. Feinberg v. Comm'r*, 808 F.3d 813, 816 (10th

Cir. 2015) (Gorsuch, J.) ("*Feinberg I*") ("[I]n our constitutional order it's

Congress that passes the laws, Congress that saw fit to enact 21 U.S.C. §

841, and Congress that in § 841 made the distribution of marijuana a

federal crime. And, frankly, it's not clear whether informal agency

memoranda guiding the exercise of prosecutorial discretion by field

prosecutors may lawfully go quite so far in displacing Congress's policy

directives as these memoranda seek to do."). More generally, like the

taxpayer in *Alpenglow*, HDR simply "has failed to demonstrate any

widespread acceptance of adoption of the '[d]ead [l]etter [r]ule' announced

in *Sterling Distributors*." 894 F.3d at 1206.

In sum, HDR has failed to demonstrate that the CSA—as to marijuana

trafficking—has succumbed to its proposed "dead letter rule," let alone in a manner that would render § 280E inoperative. Aplt.'s Opening Br. at 32–33.

## III

Based on the foregoing, we conclude that HDR is unable to overcome the government's demonstration of good faith under *Powell*, and its alternative "dead letter" argument is without merit. Accordingly, we **AFFIRM** the judgments of the two district court judges in these consolidated cases.[15]

---

[15] As with the taxpayers in *Feinberg II*, HDR is "understandably frustrated" by the potential loss of "business expense deductions under § 280E." 2019 WL 926088, at *7 n.3. "Despite operating in accordance with state law" that controls the distribution of marijuana, marijuana dispensaries like HDR "are subject to greater federal tax liability than other legitimate state businesses." *Id.* But as we stated in *Feinberg II*, any remedy for this perceived problem is beyond our purview; it "must come from Congressional change to § 280E or 21 U.S.C. § 812(c)(Schedule I) rather than from the courts." *Id.*